INTERNATIONAL ASSOCIATION OF
MACHINISTS AND AEROSPACE
WORKERS, et al., Plaintiffs,

v.

FEDERAL ELECTION COMMISSION,
et al., Defendants.

No. 81–1664.

United States Court of Appeals,
District of Columbia Circuit.

Argued En Banc Oct. 14, 1981.

Decided April 6, 1982.

John Silard, Washington, D. C., with whom Joseph L. Rauh, Jr., James C. Turner and Judy Lyons Wolf, Washington, D. C., were on the brief, for plaintiffs.

Carolyn U. Oliphant, Sp. Asst. Gen. Counsel, Federal Election Com'n, Washington, D. C., with whom Charles N. Steele, Gen. Counsel, Richard B. Bader, Asst. Gen. Counsel, and Jeffrey H. Bowman, Atty., Federal Election Com'n, Washington, D. C., were on the brief, for defendants. Kathleen Imig Perkins, Atty., Federal Election Com'n, Washington, D. C., also entered an appearance for defendants.

Before ROBINSON, Chief Judge, and TAMM, ROBB, WILKEY, WALD, MIKVA, EDWARDS and GINSBURG, Circuit Judges.

Opinion PER CURIAM.

Opinion concurring in part and concurring in the result filed by Circuit Judge HARRY T. EDWARDS.

### OUTLINE OF OPINION

| | Page |
|---|---|
| I. INTRODUCTION | 1094 |
| II. HISTORY OF THE CASE | 1095 |
| III. STANDING | 1097 |
| IV. ANALYSIS | 1099 |

 A. Is the asserted imbalance between corporations and labor unions under the 1976 FECA amendments unconstitutional? ... 1099

 1. Background of the 1976 amendments ... 1100

 2. The alleged imbalance ... 1103

 3. The standard of review ... 1105

 4. The governmental interest ... 1106

 5. Means scrutiny: to what extent are corporations and labor unions similarly situated for the purpose at hand? ... 1107

 B. Does the statute impair career employees' First Amendment right of political abstention by permitting the corporate PAC solicitation as detailed in the record? ... 1109

 1. Is solicitation of career employees inherently coercive? ... 1110

 2. The considered judgment of Congress and the deference due to it ... 1112

 C. Does the use of general corporate assets to establish and support a corporate PAC violate the First Amendment rights of dissenting shareholders? ... 1115

V. CONCLUSION ... 1118

## I. INTRODUCTION

Before this *en banc* court are three questions concerning the constitutionality of two provisions of the Federal Election Campaign Act ("FECA" or the "Act")[1] that regulate the solicitation practices of corporations and labor unions. Plaintiffs—a national labor organization and six individuals[2]—argue that Congress has acted without sufficient regard for their political speech rights and the political speech rights of others in face of the proliferation of corporate political action committees ("PACs") and their concomitant increased influence in federal elections. Specifically, plaintiffs allege that (1) Congress in the 1976 FECA amendments has created an unconstitutional imbalance between corporations and labor unions, in favor of the former, by allowing corporate PACs to solicit their executive and administrative (career) employees; (2) such corporate solicita-

---

1. Sections 321(a), (b)(2) of the Act, 2 U.S.C. §§ 441b(a), 441b(b)(2). All citations will be to the current code unless otherwise specified.

2. Plaintiffs are the International Association of Machinists and Aerospace Workers ("IAMA" or "Union"); William Winpisinger, President of IAMA and an individual eligible to vote in federal elections; Eugene Glover, an officer of IAMA and trustee of the Union's pension plan; Alan and Anne Morrison, joint shareholders of common stock of the Eaton Corporation (one of the eleven corporations targeted in plaintiffs' administrative complaint, *see* note 4 *infra*) and eligible voters in federal elections; Judy Reardon and Rebecca Ward, individuals eligible to vote in federal elections.

tion of executive and administrative employees, which occurs under inherently coercive circumstances, violates the First Amendment right of career employees to abstain from political expression; and (3) the provision of the Act that authorizes the financing of operating and administrative costs of a corporate PAC from general corporate assets violates the First Amendment rights of dissenting shareholders.

On June 3, 1981, the district court certified three questions matching these allegations pursuant to section 315(a) of the Act, 2 U.S.C. § 437h(a), the extraordinary judicial review provision of the Act, which provides: "[t]he district court immediately shall certify all questions of constitutionality of this Act to the United States Court of

Appeals for the circuit involved, which shall hear the matter sitting en banc." [3] Finding none of plaintiffs' arguments legally persuasive, we rule against them on each of the certified questions, and hold that the congressional product before us does not transgress constitutional limitations.

## II. HISTORY OF THE CASE

On October 9, 1979, plaintiffs filed an administrative complaint with the Federal Election Commission ("FEC" or "Commission"), pursuant to 2 U.S.C. § 437g(a)(1), alleging that the solicitation practices of eleven selected corporations,[4] in obtaining funds for their political action committees, contravened the prohibitions in section 441b(b).[5] Alternatively, plaintiffs argued

**3.** Because this controversy is brought here on certified questions, no dispositive order of the district court is before us for review. It appears that at least as to the certified questions, Congress vested the court of appeals with *original* jurisdiction. *See* 2 U.S.C. § 437h(a) ("the district court immediately shall certify all questions of constitutionality"); *id.* § 437h(b) ("[A]ny decision on a matter certified . . . shall be reviewable by appeal directly to the Supreme Court. . . ."). Therefore IAMA and the six individuals retain their status as plaintiffs and the Federal Election Commission, its status as defendant.

**4.** The corporations named in plaintiffs' complaint are: the International Paper Company, Standard Oil of Indiana (AMOCO), Dart Industries, Inc., Winn-Dixie Stores, Inc., the General Electric Company, Union Camp Corporation, General Motors Corporation, United Technologies Corporation, Eaton Corporation, Union Oil of California, and Grumman Corporation. All are corporations whose stock is publicly traded.

**5.** Section 441b(a) states the general principle that it is unlawful for any corporation or labor union to make a campaign contribution or expenditure except as permitted elsewhere in § 441b. In § 441b(b)(2), "contribution or expenditure" is defined to *exclude*

(A) communications by a corporation to its stockholders and executive or administrative personnel and their families or by a labor organization to its members and their families on any subject; (B) non-partisan registration and get-out-the-vote campaigns by a corporation aimed at its stockholders and executive or administrative personnel and their families, or by a labor organization aimed at its members and their families; and (C) the establishment, administration, and

solicitation of contributions to a separate segregated fund to be utilized for political purposes by a corporation, labor organization, membership organization, cooperative, or corporation without capital stock.

Section 441b(b)(7) defines "executive or administrative personnel" (also referred to herein as "career employees") as "individuals employed by a corporation who are paid on a salary, rather than hourly, basis and who have policymaking, managerial, professional, or supervisory responsibilities."

Separate segregated funds are commonly called political action committees ("PACs"). Section 441b(b)(3) limits the solicitation practices of PACs, providing that

It shall be unlawful—

(A) for such a fund to make a contribution or expenditure by utilizing money or anything of value secured by physical force, job discrimination, financial reprisals, or the threat of force, job discrimination, or financial reprisal; or by dues, fees, or other moneys required as a condition of membership in a labor organization or as a condition of employment, or by moneys obtained in any commercial transaction;

(B) for any person soliciting an employee for a contribution to such a fund to fail to inform such employee of the political purposes of such fund at the time of such solicitation; and

(C) for any person soliciting an employee for a contribution to such a fund to fail to inform such employee, at the time of such solicitation, of his right to refuse to so contribute without any reprisal.

Restated, a contribution to a PAC must be wholly voluntary. Such a contribution cannot be obtained by force or threat, it must be consensual, it may be made only after the purpose

that if the Commission construed the relevant provisions of the Act to permit the corporate conduct challenged in the complaint, then those provisions of FECA violate the First and Fifth Amendment rights of the plaintiffs. Acting on a recommendation from the Commission's General Counsel that there was no "reason to believe" the Act had been violated, the Commission, on December 13, 1979, unanimously voted to dismiss the complaint without further investigation and without an additional statement of reasons.

On February 4, 1980, plaintiffs filed a four-count complaint for injunctive and declaratory relief in the district court, pursuant to section 437g(a)(9)(A),[6] seeking review of the Commission's dismissal of their complaint. The first count alleged that "corporate PAC solicitations of unprotected career employees are yielding donations which are not free and voluntary, and constitute corporate political contributions because they result from the employment relationship." Plaintiffs maintained that because these solicitations violated the Act, the Commission failed to discharge its statutory duty to investigate; thus, the Commission's dismissal was contrary to law.

The second, third and fourth counts all alleged constitutional violations. Plaintiffs made clear in their complaint that they sought relief on their constitutional claims only if they were denied relief on the statutory count. Plaintiffs sought certification of the constitutional issues to this court pursuant to section 437h(a).

On cross-motions for summary judgment on the statutory claim, the district court upheld the Commission's dismissal of plaintiffs' administrative complaint. The Commission had previously filed a motion to dismiss the constitutional counts for failure to state a claim upon which relief can be granted and for the further reason that plaintiffs lacked standing to sue. The district court denied the motion to dismiss and announced it would certify the three constitutional questions for this court's en banc determination. The court found plaintiffs' constitutional claims "neither frivolous nor so insubstantial as to warrant dismissal for failure to state a claim."[7] As to standing, the court concluded that each of the plaintiffs had made a threshold showing of injury in fact sufficient to satisfy Article III.[8] The court further ruled that, although no corporate executive or administrative employee was party to the litigation, the plaintiffs possessed standing to assert vicariously the First Amendment rights of such employees.[9] On January 12, 1981, plaintiffs noticed their appeal from the district court's order upholding the Commission's dismissal, D.C.Cir. Docket No. 81–1044.

---

of the PAC has been disclosed and even then, only if the potential contributor knows he has the right to refuse to give to the fund with no risk of reprisal. Corporate PACs are permitted to solicit the corporation's stockholders and their families and the corporation's executive or administrative personnel and their families, and labor union PACs, the union's members and their families, subject only to the prohibitions of § 441b(b)(3).

Under § 441b(b)(4)(B), corporate solicitation of hourly employees (neither shareholders nor executive or administrative employees) and labor solicitation of non-member shareholders and employees must be confined to two written solicitations, addressed and mailed to the employees or shareholders at their residence, and designed so that the corporation or labor union, or their PAC, cannot determine who makes a contribution of $50 or less as a result of such solicitation and who does not make such a contribution. All other solicitation is prohibit-

ed under § 441b(a). The limited written solicitation permitted in § 441b(b)(4)(B) is not at issue in this case. "Solicitation," as the term is used in this opinion, refers to the oral and written solicitations permitted, prohibited, or restricted by §§ 441b(a), 441b(b)(2)–(4).

**6.** Section 437g(a)(8) provides in pertinent part: "Any party aggrieved by an order of the Commission dismissing a complaint filed by such party ... may file a petition with the United States District Court for the District of Columbia."

**7.** Memorandum Opinion, *International Ass'n of Machinists and Aerospace Workers v. FEC*, Civil Action No. 80–354, at 10 (D.D.C. December 16, 1980) [Mem. Op.], App. 19.

**8.** Mem. Op., *supra* note 7, at 10, App. 19.

**9.** *Id.*

Section 437h(a) requires a district court to certify immediately all questions of the constitutionality of the Act. However, as this court recognized in *Buckley v. Valeo*, 519 F.2d 817 (D.C.Cir.1976) (*en banc*), it is undesirable to decide a constitutional issue abstracted from its factual context.[10] Therefore, on January 8, 1981, the district court entered a consent order providing for discovery of facts concerning the solicitation practices of four of the eleven corporations named in plaintiffs' administrative complaint. On April 27, 1981, the parties signed an agreement stipulating two hundred ten findings of fact. The district court, on June 3, 1981, certified the three constitutional questions[11] and submitted as the record the findings of fact agreed to by the parties. This court gave the certified constitutional case a regular docket number, No. 81–1664.

The Commission renewed in this court its motion to dismiss for lack of standing. This court sitting *en banc* consolidated the statutory appeal in No. 81–1044 with the certification of constitutional questions in No. 81–1664, deferred decision on the motion to dismiss until after argument, and expedited the two cases as contemplated by the Act.[12]

On October 26, 1981, this court issued a judgment in No. 81–1044 affirming the district court's disposition of the statutory claim, thereby putting squarely in issue plaintiffs' three constitutional challenges. 672 F.2d 894.

## III. STANDING

The Commission contends initially that none of the plaintiffs possesses the "voter standing" section 437h(a) requires; accordingly, the plaintiffs are not eligible to invoke the expedited procedure. Second, the Commission argues that the plaintiffs have failed to meet the Article III "case or controversy" requirement. We reject both arguments and therefore deny the Commission's motion to dismiss at the threshold.

■ The text of section 437h states that these categories of plaintiffs may invoke the certification procedure: "[t]he Commission, the national committee of any political party, or any individual eligible to vote in any election for the office of President." 2 U.S.C. § 437h(a). In *Bread Political Action Committee v. FEC*, —— U.S. ——, 102 S.Ct. 1235, 71 L.Ed.2d 432 (1982), the Su-

---

**10.** The Supreme Court stated recently that "as a practical matter, immediate adjudication of constitutional claims through a § 437h proceeding would be improper in cases where the resolution of such questions required a fully developed factual record." *California Medical Ass'n v. FEC*, 453 U.S. 182, 101 S.Ct. 2712, 2720 n.14, 69 L.Ed.2d 567 (1981).

**11.** The three certified questions are:
1. Do the provisions of the FECA (2 U.S.C. § 441b(a) and § 441b(b)(2)) which ban corporate contributions to federal elections but which authorize corporate solicitation of executive and administrative employees for donations to a "separate segregated fund" which the corporation may use to contribute to federal elections, violate the rights of such employees under the First Amendment to the Constitution of the United States?
2. Do the provisions of FECA (2 U.S.C. § 441b(a) and § 441b(b)(2)) which bar corporate and union contributions in connection with federal elections but allow a corporation to make contributions through its separate segregated fund with money solicited from its stockholders and its executive and administrative personnel, and a labor union to

make contributions through its separate segregated fund with money solicited from its members, create an unconstitutional imbalance between corporations and labor unions in violation of the rights of labor unions and their members as protected by the First and Fifth Amendments?
3. Do the provisions of FECA (2 U.S.C. § 441b(a) and § 441b(b)(2)) that authorize the use of general corporate assets to pay the operating costs of a corporation's separate segregated fund that makes contributions to federal candidates violate the First Amendment rights of a stockholder who objects to the use of his corporate assets for political purposes?

**12.** *See* 2 U.S.C. § 437g(a)(10) ("Any action brought under this subsection shall be advanced on the docket of the court in which filed, and put ahead of all other actions (other than other actions brought under this subsection or under [§ 437h]")); *id.* § 437h(c) ("It shall be the duty of the court of appeals ... to advance on the docket and to expedite to the greatest possible extent the disposition of any matter certified under [§ 437h(a)].").

preme Court held that only parties who fit one of these three descriptions have recourse to the expedited, certification procedure. Accordingly, IAMA lacks the requisite statutory standing and must be dismissed as party plaintiff. The Commission maintains further that the "voter standing" Congress granted in section 437h(a) is confined to plaintiffs who put in issue their First Amendment rights *qua* voters. The individual plaintiffs, under the Commission's analysis, lack standing to utilize section 437h; although each is an eligible voter, no individual plaintiff has raised an issue as to his or her right to vote. Rather, plaintiffs raise issues as union members, as corporate shareholders, and on behalf of corporate employees, not as voters.

█ Only one decision has embraced this pinched construction of section 437h(a). In *Martin Tractor Co. v. FEC*, 460 F.Supp. 1017, 1019 (D.D.C.1978), *aff'd on other grounds*, 627 F.2d 375 (D.C.Cir.), *cert. denied*, 449 U.S. 954, 101 S.Ct. 360, 66 L.Ed.2d 218 (1980), the court stated:

> [T]he individual plaintiffs do not sue in their individual capacities to protect their individual rights to vote or even to make contributions. They sue to vindicate a claimed right of their corporate employer to influence its employees ... to make voluntary political contributions. While the question is not free from doubt, the Court has concluded that this kind of derivative right was not the constitutional right of "an individual eligible to vote" which Congress considered "appropriate" for vindication in a special declaratory judgment action under § 437h, particularly where, under the statutory scheme there is an alternative process for resolution of the substantive issue in the context of a particular transaction ....

In the case before us, plaintiffs *did* proceed under the "alternative process for resolution" of their challenges; they pursued a section 437g enforcement action. The district court removed the constitutional issues from the section 437g action and certified them to this court pursuant to section 437h. This is the proper mode of procedure for questions of the Act's constitutionality arising in section 437g proceedings. *California Medical Ass'n v. FEC*, 453 U.S. 182, 101 S.Ct. 2712, 2717–19, 69 L.Ed.2d 567 (1981).

█ *Martin Tractor* apart, we find no support for the Commission's position that section 437h(a) qualifies voters to raise constitutional issues only in relation to their rights as voters. Neither the language of the statute (*any* eligible voter, *all* constitutional questions) nor its legislative history suggests an interpretation so constricted. We note further that the Commission's view is difficult to reconcile with *California Medical Ass'n v. FEC*, 101 S.Ct. 2712 (1981), in which the Supreme Court adjudicated a section 437h challenge to a provision of the Act regulating trade association activity. In short, we reject the FEC's severely limited voter standing delineation, disapprove *Martin Tractor* to the extent it adopted the Commission's view, and hold that the plaintiffs who are "individuals eligible to vote" in federal elections have statutory standing to invoke the section 437h certification procedure. *See California Medical Ass'n v. FEC*, 101 S.Ct. at 2717 n.6 (1981); *Buckley v. Valeo*, 424 U.S. 1, 12, 96 S.Ct. 612, 631, 46 L.Ed.2d 659 (1976).

█ We are also satisfied that the individual plaintiffs have Article III standing to raise the constitutional claims. The union member plaintiffs allege that they suffer a relative diminution in their political voices—their influence in federal elections—as a direct result of the discriminatory imbalance Congress is alleged to have ordered in the 1976 FECA amendments; they further assert that a ruling declaring the amendments unconstitutionally discriminatory would likely redress their injury. Similarly, the stockholder plaintiffs allege that the use of "their" corporate assets to establish and support a PAC impinges upon their political freedoms; a ruling invalidating the authorizing statute would eliminate this asserted harm. These arguments are sufficient to establish the individual plaintiffs' standing under Article III to assert *their* First and Fifth Amendment rights. *Duke Power Co. v. Carolina Environmental*

*Study Group, Inc.*, 438 U.S. 59, 72, 98 S.Ct. 2620, 2630, 57 L.Ed.2d 595 (1978); *Warth v. Seldin*, 422 U.S. 490, 498–99, 95 S.Ct. 2197, 2204–05, 45 L.Ed.2d 343 (1975). However, no executive or administrative employees appear among the named plaintiffs.[13] Those plaintiffs seek to assert vicariously alleged First Amendment rights of career employees to abstain from political expression.

▮ The Supreme Court has repeatedly cited the prudential limitation on standing that a plaintiff generally may assert only his own legal interests, and may not raise those of third parties. *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 100, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979); *Warth v. Seldin*, 422 U.S. at 499, 95 S.Ct. at 2205 (1975). This prudential rule against the assertion of third-party claims is designed "to limit access to the federal courts to those litigants best suited to assert a particular claim," *Gladstone, Realtors*, 441 U.S. at 100, 99 S.Ct. at 1608. Because the rule is not of constitutional dimension, the Court has recognized exceptions to it in a number of cases. *See, e.g., Carey v. Population Services, Int'l*, 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977); *Craig v. Boren*, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976); *Singleton v. Wulff*, 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976); *Eisenstadt v. Baird*, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972); *Barrows v. Jackson*, 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953). Moreover, it is clear that Congress may, by legislation, permit one who satisfies Article III requisites in his own right to assert vicariously the rights of third parties. *Gladstone, Realtors*, 441 U.S. at 100, 99 S.Ct. at 1608 (1979); *Warth v. Seldin*, 422 U.S. at 501, 95 S.Ct. at 2206 (1976). We believe Congress did not wish to truncate the presentations of parties entitled to invoke the section 437h expedited, certification procedure. Therefore, we entertain the individual plaintiffs' arguments with respect to the alleged First Amendment rights of career employees. *See California Medical Ass'n*, 101 S.Ct. at 2717 n.6 (1981) ("[T]his court has held [the grant of standing under section 437h] to be limited only by the constraints of Art. III of the Constitution . . . ."); *Buckley v. Valeo*, 424 U.S. at 12, 96 S.Ct. at 631 (1976) ("It is clear that Congress, in enacting [section 437h], intended to provide judicial review to the extent permitted by Art. III."). *But cf. Bread Political Action Committee v. FEC*, —— U.S. ——, ——, 102 S.Ct. 1235, 1239, 71 L.Ed.2d 432 (1982) (In the context of considering who may invoke the expedited procedures of section 437h, the Court stated: "We do not assume the maximum jurisdiction permitted by the Constitution, absent a clearer mandate from Congress than here expressed."). The plaintiffs allege that the infringement of executive and administrative employees' right of political abstention leads to greater contributions to corporate PACs and, hence, to greater corporate PAC expenditures. This allegedly causes a relative diminution of the plaintiffs' political voices, which is one of the asserted injuries they seek to redress in this litigation.

Accordingly, we hold that the individual plaintiffs here are qualified to pursue all three constitutional challenges, including the claim that career employees are unconstitutionally exposed, by reason of the 1976 FECA amendments, to inherently coercive solicitations.

## IV. ANALYSIS

A. *Is the asserted imbalance between corporations and labor unions under the 1976 FECA amendments unconstitutional?*

The union plaintiffs claim that Congress, in the 1976 FECA amendments, restricted corporate and labor union PAC activity in an unequal and discriminatory manner, up-

---

**13.** Alan Morrison, as Director of Litigation for Public Citizen, Inc., is the only plaintiff employed as an executive or administrative employee. However, Public Citizen is a nonprofit corporation plaintiffs did not cite in their administrative complaint, and Alan Morrison does not allege that he has ever been solicited to contribute to a PAC while an executive or administrative employee of any corporation. Findings of Fact 196–198.

setting an alleged long-standing balance between corporations and labor unions, in violation of First and Fifth Amendment strictures.

### 1. *Background of the 1976 amendments.*

Congressional regulation of corporate political activity began with the Tillman Act of 1907,[14] wherein Congress prohibited corporations from making money contributions in connection with any federal election. Congress has strengthened this prohibition several times since in a continuing effort to free the political system of inordinate and improper corporate influence.[15] It was not until the War Labor Disputes Act of 1943,[16] however, that Congress brought labor unions within the reach of the prohibition.[17]

In 1971, Congress, in a major undertaking to reform the federal election laws, enacted the Federal Election Campaign Act. Congress dealt with corporate and labor union political activity in section 205 of the Act,[18] a section originally offered as an amendment by Representative Hansen. Representative Hansen stated that the purpose of the amendment "is to codify the court decisions interpreting [18 U.S.C. § 610], and to spell out in more detail what a labor union or corporation can or cannot do in connection with a federal election."[19] The amendment "draws a distinction between activities directed at the general public, which [the courts have] prohibited, and communications by a corporation to its stockholders and their families, and by a labor organization to its members and their families, on any subject, which the courts have held is permitted."[20] As to the latter, to ensure that contributions are voluntary, the amendment prohibited the use of funds obtained by force, threat of force, job reprisal or discrimination, dues or fees, a safeguard now found at 2 U.S.C. § 441b(b)(3)(A). Representative Hansen concluded that the amended "Section 610 strikes a balance between organizational rights [of corporations and labor unions] and the rights of those who wish to retain their shareholding interest or membership status but who disagree with the majority's political views."[21]

In the debate over the Hansen amendment, Congress focused on the respective interests of organization and individual, not on any balancing of corporate and labor influence. Congress appeared satisfied that existing law conformed to the legislature's wish to treat corporations and labor unions evenhandedly so that no alteration by FECA was required.[22] Thus, as amended section 610 read when the Act became law in 1972, corporations were permitted to so-

---

14. 34 Stat. 864.

15. In 1925, in § 313 of the Federal Corrupt Practices Act, Congress broadened the ban to prohibit all corporate contributions in connection with a federal election. 43 Stat. 1070. In 1947, Congress extended the prohibition to include expenditures as well as contributions, and to cover primaries, conventions, and caucuses. 61 Stat. 159. The following year Congress re-enacted this general prohibition without substantive change as 18 U.S.C. § 610.

16. 57 Stat. 164, 167.

17. In the Labor-Management Relations (Taft-Hartley) Act of 1947, Congress made this extension permanent. 61 Stat. 159.

18. This section is now codified at 2 U.S.C. § 441b(b)(2).

19. 117 Cong.Rec. 43379 (1971).

20. *Id.*

21. *Id.* at 43380.

22. Representative Hansen spoke of his amendment as "spell[ing] out more clearly the rules governing election activities that apply equally to labor unions and corporations." *Id.* at 43379. In a colloquy on the House floor, Representative Dellenback asked Representative Hansen:

> [I]s it your intention by the way you have drafted the amendment to propose that corporations and unions be treated absolutely equally?
> Rep. Hansen: That is correct.
> Rep. Dellenback: And, further, if a situation is proper for a corporation it is also proper for a union and if it is proper for a union, then it is also proper for a corporation.
> I think it is extremely important that what you have here proposed is an amendment that seeks to bring about equity.

*Id.* at 43382.

licit contributions through their political action committees from their shareholders and their families, and labor unions were allowed to solicit contributions through their PACs from their members and their families.

In the 1976 amendments, Congress added a corporation's "executive or administrative personnel and their families" to those whom a corporate PAC may solicit. This alteration was a direct response to *SUNPAC*, an Advisory Opinion the Commission issued in 1975. In *SUNPAC*, the Commission ruled, *inter alia*, that a corporate PAC could, consistent with the Act, solicit all of the corporation's employees as well as its shareholders. The debate in both Houses confirms that the single purpose of the alteration was to reject the sweeping *SUNPAC* interpretation and restore in large measure the balance thought to exist between corporations and labor unions prior to the Commission's *SUNPAC* opinion.

The House Bill, H.R. 12406, would have allowed a corporate PAC to solicit only its "executive officers" in addition to the corporation's shareholders. Representative Thompson stated that the House amendment "specifically corrects the FEC's erroneous interpretation" in *SUNPAC*.[23] According to Thompson, *SUNPAC* "drastically modified the equitable balance which had been the national policy established during the 92d Congress."[24] The House Bill would "reestablish[ ] the congressionally determined balance between interests of the business community and its stockholders, and the interests of the labor community and its membership."[25]

The House Report explicitly states that "[t]he Sun Oil [*SUNPAC*] opinion destroys the intent of the Congress to establish rules that apply equally to labor unions and corporations."[26] The House Bill proposed "three limited clarifications of the law," all of them intended by the Committee to ensure even-handed treatment of corporations and labor unions. In allowing a corporate PAC to communicate with and solicit contributions from its "executive officers," the Committee noted that it viewed "management personnel," like stockholders, "to be among the beneficial owners of a corporation."[27] The main purpose of the bill was stated as follows in the House Report:

> H.R. 12406 continues the rule that unions may only solicit those they represent—their members—and *reaffirms* the intent of the 1971 Congress that corporations must also confine their activities to a *roughly* comparable group—namely, stockholders and executive officers.[28]

The bill also provided that any method of solicitation or communication which the law permitted corporations must also be permitted labor organizations.[29]

The Senate Bill, S. 3065, employed the phrase "executive or administrative personnel" instead of "executive officers," but in all other respects relevant here it tracked the House version.[30] The Senate's intent to overturn the broad *SUNPAC* ruling is clear from the treatment accorded two amendments to the bill offered by Senator Packwood on the Senate floor. Senator Packwood first introduced an amendment which "in essence, lets everybody solicit everybody in the corporation . . . ."[31] Specifically, his first amendment would have allowed a un-

---

**23.** 122 Cong.Rec. 8881 (1976).

**24.** *Id.*

**25.** *Id. See also id.* at 8882–83 (remarks of Representative Gaydos) ("[T]he bill seeks to establish a balance between the activities of union and corporate political action committees . . . ."); *id.* at 8883 (remarks of Representative Maguire) ("All in all, the provision now in the bill appears equitable and symmetrical with respect to the rights and privileges of solicitation of funds by corporations and unions.").

**26.** H.R.Rep.No.917, 94th Cong., 2d Sess. 7 (1976).

**27.** *Id.*

**28.** *Id.* (emphasis added).

**29.** *Id.*

**30.** *See* H.R.Conf.Rep. 1057, 94th Cong., 2d Sess. 59–62 (1976), U.S.Code Cong. & Admin. News 1976, p. 929.

**31.** 122 Cong.Rec. 6958 (1976).

ion PAC to solicit non-member employees and shareholders and, symmetrically, would have permitted a corporate PAC to solicit all of the corporation's employees including union members. Senator Packwood acknowledged the amendment "pretty much, puts the situation back where the Federal Election Commission had left it with their rulings in the creation of what was known as the *SUNPAC* decision." But he believed it treated labor unions and corporations "equitably." [32] The Senate, without debate, rejected this amendment, 40–45.[33]

Senator Packwood introduced next "the middle ground amendment," a proposal which would have extended corporate and union solicitation to middle level employees. Conceding that strong labor opposition to the *SUNPAC* ruling justified some restrictions on corporate solicitation of employees, Packwood nevertheless pointed out that under the Senate Bill "nonsupervisory, nonunionized employees, who are half of the work force of the major corporations in this country, cannot be solicited by the union and cannot be solicited by the employer." [34] These middle level employees, Packwood urged, have a stake in what both corporation and labor union do that affects them, therefore both union PACs and corporate PACs should be allowed to solicit them. Other Senators expressed concern over the potential for coercion, actual and perceived, in permitting solicitation of these non-supervisory, non-union employees.[35] Although Packwood attempted to assure his colleagues that coercion was illegal under present law and would remain so under his amendment, the Senate rejected this amendment, too, 33–47.[36] Senator Dole,

speaking of the provision concerning PACs just before the vote on the entire bill, stated, "Although the compromise reached with respect to solicitation of funds from employees may not be totally consistent with the *SUNPAC* decision, it probably also represents a fair settlement of the issue." [37]

The substitute bill as reported out of conference employed the Senate language "executive or administrative personnel." The Conference Report defined "executive or administrative personnel" as "employee[s] who [are] paid on a salary, rather than hourly, basis and who ha[ve] policymaking, managerial, professional, or supervisory responsibilities." [38] The Report explained further:

> The term "executive or administrative personnel" is intended to include the individuals who run the corporation's business, such as officers, other executives, and plant, division, and section managers, as well as individuals following the recognized professions, such as lawyers and engineers, who have not chosen to separate themselves from management by choosing a bargaining representative; but is not intended to include professionals who are members of a labor organization, or foremen who have direct supervision over hourly employees, or other lower level supervisors such as "strawbosses".[39]

Concerning the balance Congress intended to restore in these amendments, the Conference Report contains only a passing reference to "the general rule inherent in the plan of the entire section—that unions insofar as they are employers,[40] stand in the

---

**32.** *Id.*

**33.** *Id.*

**34.** *Id.* at 6959.

**35.** *See id.* at 6959–60 (remarks of Senator Bumpers); *id.* at 6960 (remarks of Senator Brock).

**36.** *Id.* at 6962.

**37.** *Id.* at 7923.

**38.** H.R.Conf.Rep. 1057, 94th Cong., 2d Sess. 62 (1976), U.S.Code Cong. & Admin.News 1976, p. 977.

**39.** *Id.* U.S.Code Cong. & Admin.News 1976, p. 577.

**40.** Footnote added. "Employers" should read "solicitors," because Congress did not authorize union PACs to solicit nonmember employees.

same shoes as corporations ...."[41] Congress was not unaware, however, that the balance struck in 1976 was different from the one that existed prior to the *SUNPAC* ruling. In presenting the Conference Bill to the House, Representative Hays stated:

> The individuals ... whom a corporation may ... solicit[ ] for contributions to a political fund was *broadened* to include professional employees who are not represented by a bargaining agent and supervisory employees other than foremen who directly supervise rank-and-file employees.[42]

Representative Brademas concluded that Congress has restored the *ante-SUNPAC* balance "in a manner that is fair and even-handed .... [I]f the word 'fairness' implies a balancing of rights, this bill represents an equitable balance between the rights of corporations and labor unions. It is the product of deliberation, negotiation and compromise." [43]

In sum, our review of the relevant legislative history convinces us of two things: (1) Congress intended to overrule the *SUN-PAC* decision in substantial part and re-es-tablish *a* balance similar, but not identical, to the one Congress codified in 1971; (2) there was a general consensus that the amendments achieved this purpose and did so equitably.[44]

### 2. *The alleged imbalance.*

Plaintiffs, in light of the legislative history just recounted, do not claim that Congress in 1976 *intended* to tip the balance in favor of corporations. Rather, they accuse Congress of lacking the prescience to comprehend the *effect* of unleashing corporate PACs to solicit career employees: an "explosive" growth both in the number of corporate PACs and in their influence in federal elections, disproportionate to that of union PACs.

Plaintiffs cite the following figures and invite comparison. In 1975, 139 corporate PACs raised $5.8 million; 226 union PACs raised $18.5 million. By 1980, however, there were 1204 corporate PACs with a combined campaign chest of $34 million. The number of labor PACs increased in the same period only incrementally to 297; they

---

**41.** H.R.Conf.Rep. 1057, 94th Cong., 2d Sess. 64 (1976), U.S.Code Cong. & Admin.News 1976, p. 979.

**42.** 122 Cong.Rec. 12198 (1976) (emphasis added). Remarks of Representative Brademas, however, indicate that some members believed mistakenly that the 1976 amendments simply restored the *status quo ante.*

> Congress [in 1971] sought to establish a balance between the political activities allowed to corporations and labor unions in order that the extent of political activities carried on by either kind of entity might not burgeon so as completely to overwhelm the activities of the other.
> Congress specifically did not allow either corporations or labor unions to cross-solicit contributions from each other's respective constituencies. *Because the rationale for allowing a corporation to play a role in Federal elections was the legitimate interests of its owners and management, Congress restricted the solicitation rights of a corporation to its stockholders and managerial employees.* And because the rationale for allowing labor unions to play a role in Federal elections was the legitimate interests of its members, Congress restricted the solicitation rights of a labor union to its members.

> Mr. Speaker, this system worked well for a number of years, until last winter when a majority of the members of the Federal Election Commission arrogated to themselves the right to change the rules.... [W]hat the conference committee has done is to restore the rules which governed Federal elections from 1971 until the Commission's Sun Oil decision last December.

*Id.* at 12203–04 (emphasis added). The rationale Representative Brademas recites fits more neatly the 1976 amendments *adding* executive and administrative employees than the 1971 Act which *by its terms prohibited* corporate PACs from soliciting all non-stockholder employees.

**43.** *Id.* at 12204.

**44.** Ironically, members who rose to protest the unfairness of the amendments objected to what they perceived as a pro-labor bias in the bill. *See id.* at 12204 (remarks of Representative Rhodes); *id.* at 12206 (remarks of Representative Rousselot); *id.* (remarks of Representative Devine); *see also* H.R.Rep.No.917, 94th Cong., 2d Sess. 92 (1976) (minority views of Representative Frenzel); *id.* at 95–96 (minority views of Representative Moore).

raised $26 million.[45] Plaintiffs estimate that 90% of corporate PAC funds are derived from executive and administrative employees.[46] Plaintiffs' figures do not inform us how many career employees were open to solicitation pre-1976 as shareholders.[47] Nor, taking into account that labor union PACs just a few years ago were more prevalent, wealthier, and more powerful than corporate PACs, do plaintiffs entertain the possibility that the relative strength of corporate and labor PACs may swing pendulum-like in step with the political fortunes of the day. Plaintiffs demonstrate a connection in time (and argue a causal connection) between the *SUNPAC* ruling, the 1976 amendments, and the proliferation of corporate PACs. It is the statute, they argue—specifically the provision authorizing corporate solicitation of career employees—that "allows and invites a large and growing imbalance between corporate and union PAC funds." [48]

Although plaintiffs recite a host of figures to dramatize this disparity, the imbalance of which they complain is not purely one of dollars and cents. Instead, the imbalance Congress is said to have created in 1976 is *institutional*, a matter of *capacity*, and thus outside the power of labor unions to correct. According to plaintiffs, there simply are many more major corporations (and many more career employees to be solicited) than there are major labor unions (and union *employees*).[49] Because most

**45.** Brief for Plaintiffs at 14, 16 Fig. 1.

**46.** *Id.* at 18 & n.6: "Discovery of the four corporations in the District Court revealed that the average proportion of their PAC funds derived from employee contributions was 91.5% in 1979." Defendants do not specifically controvert this estimate.

**47.** No doubt there were pre-1976 and are today many career employees with shareholdings in the corporations that employ them. However, the materials before us do not indicate the extent to which the category "career employees" overlaps with the category "shareholders" and we do not rely in our analysis on any speculation in this regard.

**48.** Brief for Plaintiffs at 20.

**49.** Plaintiffs cite these figures:
[T]here are 1420 major corporations in the nation each with 2,500 or more employees .... Among them at least 125 (5%) at each company are administrative and executive personel [sic].... The combined employment force of these large corporations is 18.9 million workers ...; the 5% executive and administrative portion of that work force represents 945,000 career workers whom these major corporations can tap for employee-derived corporate funds used in federal elections.
Brief for Plaintiffs at 14. By comparison, "the combined number of national and local unions [with 125 or more *employees*] is only 107, and they have a total workforce of only 23,645 employees." *Id.* at 15 (emphasis added).
Although the figures plaintiffs cite are provocative, they are less than fully persuasive of the institutional imbalance of which plaintiffs complain in this suit. The 1976 amendments plaintiffs challenge allow a labor PAC to solicit its *members and their families, albeit not non-*member employees. Union members, whether or not employees of the union, certainly form a substantially larger pool from which labor PACs may solicit contributions than union employees. Plaintiffs do argue elsewhere that because career employees are solicited under inherently coercive circumstances, *see* Part B *infra*, they are more likely to contribute than union members solicited by union PACs, and also more likely to contribute a greater amount of money than the average union member is willing or able to contribute.
The Commission invites us to look at the same figures from another angle. First, the balance, or "parity," between corporate and labor PAC funds plaintiffs say existed before SUNPAC and the 1976 amendments was, at least numerically, no such thing ($18.5 million for labor PACs in 1976, compared to $5.3 million for corporate PACs; 226 labor PACs in contrast to 139 corporate PACs). This, of course, refutes only any basis for a claim of pre-existing parity in funds collected and number of PACs. As a matter of capacity, there may have been a parity between shareholders and union members. *See* H.R.Rep.No.917, 94th Cong., 2d Sess. 7 (1976) ("There are as many corporate shareholders as there are union members."). Nonetheless, compared with the 1976 situation, the 1980 disparity in favor of corporate PACs ($35 million to $26 million) does not appear startling.
Second, the Commission points out that, accepting plaintiffs' estimate that 90% of corporate PAC funds are employee-derived, without the 1976 amendments authorizing such solicitation corporate PACs would have raised a paltry $3.5 million compared to the $26 million labor PACs raised. Brief for Defendants at 26. The Commission suggests that, far from creating an imbalance, the 1976 amendments brought corporate and labor PAC funds roughly in line with each other. But see note 47 *supra*.

major corporations have not yet set up a political action committee,[50] plaintiffs' argument continues, the chasm between corporate and labor PAC funds promises to widen even more.

Plaintiffs do not object, however, to the proscription on labor PAC solicitation of non-member union employees (or non-member corporate employees). Even if Congress drew the 1976 amendments in a facially equal manner (corporate and labor PACs may solicit their respective career employees; or corporate and labor PACs alike may solicit all corporate employees, regardless of union membership, and all shareholders), plaintiffs would still press their discrimination claim.[51] In sum, the union plaintiffs challenge here congressional action that frees corporate PACs to amass funds that labor union PACs allegedly could not attract even if they were permitted to try.

### 3. *The standard of review.*

The union plaintiffs argue that the 1976 amendments, which authorize labor PACs to solicit their members but which authorize

corporate PACs to solicit their career employees in addition to their shareholders, violate the equal protection component of the Due Process Clause of the Fifth Amendment.[52] They argue conjunctively that this disparate treatment violates their First Amendment rights. Urging linked consideration of these two constitutional safeguards, plaintiffs rely on decisions focused on the "intersection" of equal protection and First Amendment guarantees, most notably, *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), and *Police Department v. Mosley*, 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972). They maintain that the 1976 amendments must be scrutinized strictly and assert that the Commission has not adequately justified the amendments' disparate impact on corporate and labor PACs.

■ While heightened scrutiny often attends a legislative classification alleged to impinge on First Amendment interests,[53] we reject plaintiffs' argument that the most stringent review standard should apply in this case.[54] Decisions in point may

Finally, amici in No. 81–1044 alert us to the massive amounts raised and spent by PACs not connected to either a corporation or labor union, such as trade association, cooperative, and ideological PACs. The Commission reported that this third group spent more money in 1980 in federal elections than all corporate and labor PACs combined. Brief for Amici General Electric, *et al.* at 5 & n.2.

**50.** "More than two-thirds of Fortune's 1000 leading industrial corporations do not yet have a PAC." Brief for Plaintiffs at 14. Again, the inferences plaintiffs draw are not inevitably correct. According to the FEC, the rate of growth of corporate PACs has declined recently. Further, amici in No. 81–1044 point out that the smaller the corporation, the less likely it will establish a political action committee; if formed, the size of the PAC will likely correspond to the size of the firm. Brief for Amici General Electric, *et al.* at 5. Thus, the estimate of a total workforce of nearly a million executive and administrative officers susceptible to corporate PAC solicitation, *supra* note 49, may be highly exaggerated. *See also* note 47 *supra* (shareholding corporate officers are open to solicitation without regard to their status as career employees).

**51.** We assume that a substantial number of union employees are also members of the union

for which they work so that a FECA amendment authorizing labor PACs to solicit their nonmember employees would not result in an appreciable increase in labor PAC funds. At oral argument counsel for IAMA estimated that 900 of the 1100 IAMA employees are members of the union.

**52.** Because plaintiffs challenge congressional action, the Fifth Amendment rather than the Fourteenth Amendment governs. Implicit in the Due Process Clause of the Fifth Amendment, the Supreme Court has several times noted, is an equal protection guarantee approximating the explicit guarantee contained in the Fourteenth Amendment. *Hampton v. Mow Sun Wong*, 426 U.S. 88, 100, 96 S.Ct. 1895, 1903, 48 L.Ed.2d 495 (1976); *Buckley v. Valeo*, 424 U.S. 1, 93, 96 S.Ct. 612, 670, 46 L.Ed.2d 659 (1976); *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n.2, 95 S.Ct. 1225, 1228, 43 L.Ed.2d 514 (1975).

**53.** *See, e.g., Community-Service Broadcasting of Mid-America, Inc. v. FCC*, 593 F.2d 1102, 1122–23 (D.C. Cir. 1978) (*en banc*).

**54.** *Cf. Citizens Against Rent Control/Coalition for Fair Housing v. City of Berkeley*, —— U.S. ——, 102 S.Ct. 434, 436, 438, 70 L.Ed.2d 492

lack perfect consistency and crystal clarity, but they do reveal that the nature and quality of the legislative action at issue determine the intensity of judicial review of intertwined equal protection, First Amendment claims.[55] We note in that light that the particular congressional action plaintiffs assail does not encroach directly or, on its face, place limits on any individual's speech or participation in the electoral process. In this respect, neither *Mosley*, involving an ordinance allowing one group, but not others, to picket, nor *Buckley v. Valeo*, involving limitations on campaign contributions and expenditures, nears plaintiffs' mark. Moreover, we underscore again that plaintiffs do not seek for union PACs the permission Congress granted corporate PACs to solicit career employees. Rather, plaintiffs want to tighten or reinstate a governmental limitation on political activity, *i.e.*, they would preclude corporate PACs from soliciting career employees, in order to maintain a balance between electoral messages spread by corporations and those spread by unions.[56]

■ *Mosley* itself enunciated review standards that were not the most exacting,[57] and *Buckley v. Valeo* drew distinctions bearing on the rigorousness of review based on the character of the several legislative proscriptions the Court scrutinized. *See, e.g.*, 424 U.S. at 95–96, 96 S.Ct. at 671. We are therefore confident that the matter before us does not call for a review standard more demanding than this elevated, but not strictest,[58] test: the challenged legislative action must bear a substantial relation to an important governmental interest.[59]

### 4. *The governmental interest.*[60]

Plaintiffs phrase their objection to the 1976 amendments in terms of the *ends* Con-

(1981) (subjecting to "exacting judicial scrutiny" a limitation on the size of contributions to committees formed to support or oppose ballot measure referenda, a restriction the Court's majority viewed as directly encroaching on political expression).

**55.** *See particularly Perry Local Educators' Ass'n v. Hohlt*, 652 F.2d 1286 (7th Cir. 1981) (Wisdom, J., sitting by designation), *possible jurisdiction postponed*, —— U.S. ——, 102 S.Ct. 997, 71 L.Ed.2d 291 (1982) *cf. National Black United Fund, Inc. v. Devine*, 667 F.2d 173, 179 (D.C. Cir. 1981).

**56.** *But cf. Buckley v. Valeo*, 424 U.S. at 48–49, 96 S.Ct. at 648–649 ("concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment"), *quoted in Citizens Against Rent Control*, 102 S.Ct. at 437.

**57.** The Court has recently restated the *Mosley* standard as follows: "[T]he Equal Protection Clause mandates that the legislation be finely tailored to serve substantial state interests, and the justifications offered for any distinctions it draws must be carefully scrutinized." *Carey v. Brown*, 447 U.S. 455, 461–62, 100 S.Ct. 2286, 2290–91, 65 L.Ed.2d 263 (1980). *See also* Gunther, The Supreme Court, 1971 Term—Foreword: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection, 86 Harv.L.Rev. 1, 17–18 (1972) (suggesting that the Court, in explicating the standard of review, deliberately avoided traditional equal protection rhetoric).

**58.** The strictest standard demands a "compelling" governmental interest and a classification "necessary" to achieve the compelling interest. *See, e.g., Eisenstadt v. Baird*, 405 U.S. 438, 447 n.7, 92 S.Ct. 1029, 1035 n.7, 31 L.Ed.2d 349 (1972); *Dunn v. Blumstein*, 405 U.S. 330, 337, 92 S.Ct. 995, 1000, 31 L.Ed.2d 274 (1972); *Shapiro v. Thompson*, 394 U.S. 618, 634, 89 S.Ct. 1322, 1331, 22 L.Ed.2d 600 (1969). *See generally* Developments in the Law—Equal Protection, 82 Harv.L.Rev. 1067, 1087–1132 (1969).

**59.** Plaintiffs further urge that this case can be accommodated within the rubric of case law involving the right to vote, a fundamental right triggering strict scrutiny, at least when the state's restriction is direct and substantial. *See* Brief for Plaintiffs at 24–25. But it stretches too far to characterize the claims before us as involving the right to vote; rather, plaintiffs charge Congress with the creation of a scheme regulating unevenly political expression in connection with federal elections.

**60.** We do not review the 1976 amendments in a vacuum, but in light of the Act as enacted in 1971 and altered by the 1975 *SUNPAC* ruling. The administrative gloss on the Act the Commission supplied in *SUNPAC* was the *status quo* on which Congress operated in 1976. Congress saw *SUNPAC* as the problem and acted to alter that ruling by permitting corporate PACs to solicit only their career employees, not their entire workforce, as *SUNPAC* allowed.

gress may have sought to achieve by permitting corporate PACs to communicate with and solicit executive and administrative employees.[61] But their objection is more appropriately addressed to the *means* Congress chose to serve an indisputably important governmental interest: impartial FECA *treatment* of corporations and labor unions.[62] It confounds means and ends scrutiny to demand, as plaintiffs do, that Congress explicate a substantial government interest in adding career employees to the pool of permissible corporate solicitees. As developed earlier,[63] the 1976 amendments at issue were designed to restore a balance to FECA's treatment of corporations and labor unions, a balance the Commission in its *SUNPAC* ruling had upset. It is true that the balance Congress struck in 1976 differs from the one arrived at in 1971. But the goal of Congress has remained the same.[64] Thus, whether the 1976 amendments survive constitutional review turns on the degree of precision with which Congress has achieved its unquestionably proper purpose: does the legislative scheme of section 441b(b)(2), as amended in 1976, bear a substantial relation to the important governmental interest in applying the federal election laws even-handedly to labor unions and corporations?

**61.** Brief for Plaintiffs at 29–30, Reply Brief at 7.

**62.** While Congress intended to treat corporations and labor unions alike, it did not intend to *equalize* the relative resources or influence of corporations and organized labor.

**63.** *See* text at pages 1101–1103 *supra.*

**64.** *Compare* 117 Cong.Rec. 43382 (1971) (colloquy between Representatives Dellenback and Hansen), *quoted at* note 22 *supra,* and 122 Cong.Rec. 12198 (1976) (remarks of Representative Brademas), *quoted at* note 42 *supra, with* text accompanying notes 23–44 *supra.*

**65.** *See* text accompanying notes 45–50 *supra.*

**66.** *But see* note 56 *supra.*

**67.** Conceivably, Congress might have believed that only by permitting corporate PACs to solicit career employees would there be a rough balance in the strength of corporate and labor union PACs. We find no support for this proposition in the legislative history. To restore a

### 5. *Means scrutiny: to what extent are corporations and labor unions similarly situated for the purpose at hand?*

Congress apparently did not consider the difference in capacity between corporate and labor PACs when it framed the 1976 amendments. But, as we observed earlier, no disparity in favor of corporations existed in 1976.[65] Although plaintiffs seem to charge Congress with a duty to prevent such a disparity from developing,[66] their more basic complaint poses an obvious question: if Congress in the 1976 amendments intended to restore the balance upset by the Commission in *SUNPAC*, why did it not simply reaffirm the 1971 scheme, under which unions were permitted to solicit their members, and corporations their shareholders? Why did Congress add career employees to those whom a corporate PAC may solicit? Two related considerations lead us to reject plaintiffs' argument that this discrepancy renders the statute unconstitutional.[67]

First, Congress found, and plaintiffs do not contest, that executive and administrative employees share with stockholders a stake in the corporation's well-being.[68] Recognizing a corporation's "right" to communicate with and solicit those who share an identity of interest with it,[69] Congress

balance, Congress overruled *SUNPAC* to the extent that it authorized corporate solicitation of hourly employees. Congress did not permit solicitation of career employees out of any stated concern for an equilibrium between corporations and labor unions. Rather, Congress focused on the relationship of the career employee to his corporation, comparing that relationship to the shareholder-corporation relationship in terms of a community of shared interests. *See* text accompanying notes 68–69 *infra.*

**68.** *See* H.R.Rep.No.917, 94th Cong., 2d Sess. 7 (1976), *quoted at* text accompanying notes 27–28 *supra.*

**69.** *See, e.g.,* text accompanying notes 20–21 *supra* (intent of 1971 Hansen amendment); note 42 and text accompanying note 43 *supra* (congressional recognition in 1976 of corporate interests). *See also First National Bank of Boston v. Bellotti,* 435 U.S. 765, 776–83, 98 S.Ct. 1407, 1415–19, 55 L.Ed.2d 707 (1978) (corporate speech entitled to First Amendment protection).

simply extended the exercise of this right to communications with and solicitation of career employees. Congress thus tendered a sensible response to *SUNPAC*: it cut back the Commission's decision by excluding from corporate solicitation the bulk of the workforce, but it recognized that upper echelon personnel may identify with the corporation at least as much as shareholders do.

Second, in attempting to treat corporations and labor unions equally, Congress believed it was necessary in 1976—as it was in 1971—to take into account their structural differences. Technically, shareholders own the corporation. While union members do not "own" their union in the same technical sense, there is more than a kernel of truth in describing members as "owners." The union membership resembles a corporation's stockholders in that each group is the source of legitimacy and power for the organization's management and leadership. Thus, it follows that Congress would consider sound the analogy: union members are to their union as shareholders are to their corporation. In theory, directors, officers, and upper management run the corporation pursuant to the wishes of the shareholders. But corporate democracy is in many respects more theoretical than real. It is, if anything, more likely that a corporation's career employees will identify with the corporate direction, purpose, and welfare than will a shareholder who does not own a controlling interest. Congress took note of this likelihood in 1976 and thought it reasonable to allow a corporate PAC to solicit these employees. If there is an appropriate analogy, it might be either: career employees are to their corporation as union leadership is to its union, or union career employees are to their union. To achieve symmetry in 1976, Congress might have authorized union PACs to solicit their leadership or their career employees. How-

ever, this would have scant practical effect since it appears that the vast majority of union career employees and union leaders are also union members.[70] As has been noted, the House Report indicates Congress believed the 1976 classification was drawn fairly:

> H.R. 12406 continues the rule that unions may only solicit those they represent—their members—and *reaffirms the intent of the 1971 Congress that corporations must also confine their activities to a roughly comparable group*—namely, stockholders and executive officers.[71]

Our conclusion that differences in organizational structure allow Congress to shape the election laws to reflect those differences is supported by two recent decisions involving equal protection challenges to FECA. In *Bread Political Action Committee v. FEC*, 635 F.2d 621 (7th Cir. 1980) (en banc), *rev'd on other grounds*, —— U.S. ——, 102 S.Ct. 1235, 71 L.Ed.2d 432 (1982), a trade association PAC argued that section 441b(b)(4)(D) deprived it of equal protection because under the statute, a trade PAC must obtain prior approval of a member corporation before soliciting that corporation's permissible solicitees. In rejecting that claim, the court pointed out that

> the somewhat dissimilar treatment of corporations, labor organizations, membership organizations and trade associations under Section 441b(b)(4) follows from the rather obvious facts that each of the different groups has a different structure and a different kind of constituency and that each requires somewhat different regulations to curb abuses the Act was intended to halt.

635 F.2d at 630.[72] And in *California Medical Ass'n v. FEC*, 453 U.S. 182, 101 S.Ct. 2712, 69 L.Ed.2d 567 (1981), the Supreme Court rejected an equal protection claim

---

**70.** *See* note 51 *supra.*

**71.** H.R.Rep.No.917, 94th Cong., 2d Sess. 7 (1976) (emphasis added).

**72.** The court concluded that plaintiffs "fail[ed] to demonstrate how trade associations and labor organizations are 'similarly situated' par-

ties." 653 F.2d at 651. We do not conclude that corporations and labor unions are so "dissimilarly situated" that equal protection scrutiny may be avoided. Indeed, the legislative scheme of FECA indicates that Congress considered them in many respects "similarly situated." *See, e.g.*, §§ 441b(a), 441b(b)(2), (5).

that section 441a(a)(1)(C) imposed a greater burden on unincorporated associations and individuals than on corporations and labor unions.[73] The Court commented:

> The differing restrictions placed on individuals and unincorporated associations, on the one hand, and on unions and corporations, on the other, reflect a judgment by Congress that these entities have differing structures and purposes, and that they therefore may require different forms of regulation in order to protect the integrity of the electoral process.

101 S.Ct. at 2724.

Congress might have established a different scheme. Indeed, it might simply have directed a return to the 1971 "balance." We are not convinced, however, that the 1971 balance would be any more "equal" than the one struck in 1976.[74]

It is unlikely Congress will ever be able to achieve a perfect balance between the relative influence of corporations and labor unions in federal elections. In any event, the Constitution, as historically and currently interpreted, does not afford any guarantee against one person's or group's ability to fund more speech than can another. In fact, far from imposing on Congress an obligation to equalize the voices of cor-

porate and labor PACs, the Constitution, as the Supreme Court now reads it, may forbid Congress to act in such a manner. *See Buckley v. Valeo*, 424 U.S. at 48–49, 96 S.Ct. at 648–649, *quoted in Citizens Against Rent Control/Coalition for Fair Housing v. City of Berkeley*, —— U.S. ——, 102 S.Ct. 434, 437, 70 L.Ed.2d 492 (1981). Congress, in 1971 and 1976, attempted to treat corporations and labor unions in a relatively comparable manner. We hold that the 1976 amendments the plaintiffs challenge are substantially related to this important objective, and therefore do not deprive plaintiffs of equal protection.

**B.** *Does the statute impair career employees' First Amendment right of political abstention by permitting the corporate PAC solicitation as detailed in the record?*[75]

 In their second constitutional claim plaintiffs champion the First Amendment right of career employees to political abstention. Plaintiffs allege that corporate PACs solicit their executive and administrative personnel under circumstances that are inherently coercive even though statutorily unobjectionable.[76] They argue that because

---

**73.** Section 441a(a)(1)(C) prohibits individuals and unincorporated associations from contributing more than $5,000 in any calendar year to any multicandidate PAC.

**74.** *See* notes 49–50 *supra.*

**75.** The question certified by the district court has been restated with sophistication in the parties' briefs. The district court asked simply whether the provision authorizing corporate PAC solicitation of executive and administrative employees violated the First Amendment rights of those employees. Plaintiffs state, elaboratively, that the statute impairs career employees "First Amendment liberty of political abstention" "if [it] authorizes a corporation to pressure its employees to make payments to the company PAC." Brief for Plaintiffs at 31; Reply Brief at 8. Plaintiffs would thus focus our attention on the detailed findings of fact they rely upon to demonstrate the inherently coercive nature of corporate PAC solicitation of executive and administrative personnel. We address this evidence, *see* text accompanying notes 78–85 *infra*, but note at the outset that plaintiffs' apparent concession that absent a finding of coercion this constitutional claim cannot

succeed. As we explain later, *see* pages 1110–1112 *infra*, we conclude that the record before us falls far short of establishing coercion.

The Commission rephrases the question this way: "whether *Congress's decision to prohibit coercive* solicitations of corporate executive and administrative personnel is sufficient to protect their rights under the first amendment." Brief for Defendants at 35 (emphasis added). Plaintiffs, however, argue that Congress has *permitted* solicitation under *inherently* coercive circumstances. We respond in this section to the issue plaintiffs tender.

**76.** Originally, plaintiffs alleged in their administrative complaint that (1) the inherently coercive solicitation practices of corporate PACs (group solicitation, in-person solicitation, and supervisor solicitation) violated § 441b(b)(3); and (2) because inherently coercive supervisor solicitations beget involuntary contributions—contributions derived from the employment relationship—the Commission should pierce the career employee veil and treat as *corporate* contributions the *individual* contributions of executive and administrative employees. So treated, the contributions would run afoul of

the nature of the employment relationship renders these solicitations "pregnant with coercion," career employees often must surrender or compromise their rights of political association and expression so as to avoid incurring the displeasure of their corporate superiors. Plaintiffs conclude that because Congress in the 1976 amendments explicitly authorized corporate solicitation of executive and administrative employees, this corporate PAC activity bears the imprimatur of the state and therefore contravenes the First Amendment.

Essential to plaintiffs' claim of a *constitutional* violation is a "governmental (state) action" foothold. The Commission maintains that a decision by Congress simply to permit corporate PACs to solicit career employees does not stamp as "state action" otherwise private corporate conduct. In its most recent statement on point, the Supreme Court rejected expansive application of the concept that state action may be indicated by state authorization of private sector activity. The Court summarized: "Our cases state 'that a State is responsible for [the] act of a private party when the State, by its law, has compelled the act.' This Court, however, has never held that a State's mere acquiescence in a private action converts that action into that of the State." *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 164, 98 S.Ct. 1729, 1737, 56 L.Ed.2d 185 (1978) (UCC-authorized sale of bailed goods to satisfy warehouseman's lien is not state action and therefore need not be attended by constitutional guarantees regarding minimal hearings). We pretermit a decision on the state action question, however, in view of the not altogether settled state

the Act's general ban on corporate contributions contained in § 441b(a). The Commission's interpretation of the Act—that it proscribes only what is specifically described in § 441b(b)(3)(A)–(C)—was upheld by the district court as reasonable and consistent with law. Mem. Op., *supra* note 7, at 5–8, App. 14–17. The district court's decision was affirmed by order of this *en banc* court. *International Ass'n of Machinists & Aerospace Workers v. FEC*, 672 F.2d 894 (D.C. Cir. 1981) (*en banc*). Thus plaintiffs are left to argue that the solicitation the statute permits is rendered impermissible by the Constitution.

of the law, *cf. Abood v. Detroit Board of Education*, 431 U.S. 209, 218 n.12, 97 S.Ct. 1782, 1790 n.12, 52 L.Ed.2d 261 (1977); *Reitman v. Mulkey*, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967), and because we conclude that even if the requisite state action were present, plaintiffs' challenge would not succeed.

In the discussion that follows we explain why we reject plaintiffs' argument that allowing corporate PACs to solicit executive and administrative personnel sanctions solicitation that is "inherently coercive." On the record before us, and in view of the safeguards against coercion with which Congress has brigaded corporate PAC solicitation,[77] we cannot conclude that such solicitation inevitably forces career employees to compromise their political beliefs in order to avoid jeopardizing their corporate positions.

1. *Is solicitation of career employees inherently coercive?*

Plaintiffs complain that "employees are donating to the corporate political fund because of the employment relationship and its pressures—pressures which the company solicitations consciously and effectively exploit."[78] They add that because there is an "inherently sensitive and unequal relationship between an employer and his employees[,] . . . these solicitations are 'pregnant with coercion.'"[79] In particular, plaintiffs argue that the supervisor solicitation, in-person solicitation, and group solicitation methods corporate PACs employ[80] are inherently coercive, notwithstanding literal observance of the solicitation restrictions in section 441b(b)(3)(A)–(C).[81]

**77.** *See* § 441b(b)(3)(A)–(C), *supra* note 5.

**78.** Brief for Plaintiffs at 31.

**79.** *Id.* at 36.

**80.** The solicitation methods of the four corporate PACs examined by the district court are summarized in the certified Findings of Fact, 1–79, 93–102, App. 26–52, 55–57.

**81.** Corporate PACs may not use force or threat of force, job discrimination, or financial reprisal in soliciting career employees. Also, cor-

To demonstrate that these methods of solicitation are *per se* coercive, plaintiffs lean heavily on statistics assembled in the record. Plaintiffs point out that executive and administrative employees "give to the corporate political fund at rates [82] and in amounts [83] far beyond those which obtain when donors are not solicited to give to the institution that employs them." [84] We demur to this statement. Plaintiffs infer from the figures they cite that career employees contribute at such rates and in such amounts because of the "employment relationship" and its inherent pressures. But this inference is not the only or even the plainest one the statistics suggest. From the very same figures one could argue with equal force that career employees contribute to their corporate PACs out of a desire

to further what they perceive to be their own best interests or the best interests of the corporation, and because they have the wherewithal to do so, not because they are coerced or intimidated. Congress considered executive and administrative personnel, like shareholders, to have a beneficial stake in the welfare of the corporation; it therefore expressly permitted corporate PAC communications with and solicitation of these higher level employees.[85] As noted earlier, it may be that, in general, executive and administrative employees are more likely to identify with their employer (and therefore the employer's political interests as expressed through its PAC) than is a non-employee shareholder with the corporation whose shares he has purchased in the market.[86] On the record before us, it suf-

---

porate PACs routinely afford employees they solicit a rough analogue of *Miranda* rights: The PAC informs the solicitee of the purpose of the PAC and the right to refuse to contribute without fear of reprisal.

**82.** Footnote added. The picture plaintiffs paint in their brief is misleading. They cite statistics demonstrating that "senior executives," "senior management employees," "executive employees," presidents, and officers contribute at rates between 60 and 95%, compared to a rate of less than one percent for shareholders. The figures drop considerably when one considers the percentage of *all* executive and administrative personnel that contribute to their corporation's PAC. The district court found that of those career employees solicited to contribute to their corporation's PAC, a substantially smaller percentage chose to contribute. Findings of Fact 63 (Dart: for 1978, 15.8%; 1979, 16.8%; 1980, 11.8%); 66 (Eaton: for 1977, 51.8%; 1981, 45%); 68 (United Technologies: for 1978, 6.6%; 1979, 2.9%; 1980, 7.8%); 71 (Winn-Dixie: for 1978, 10.2%; 1979, 14.5%; 1980, 15%), App. 49–51. These figures generally fall within rates the Supreme Court has considered in an analogous situation to indicate an absence of coercion. *Pipefitters Local Union No. 562 v. United States*, 407 U.S. 385, 418 n.30, 92 S.Ct. 2247, 2266, 33 L.Ed.2d 11 (1972) ("Indeed, the amount of individual contributions actually collected by PAC evidences that it successfully informed CIO members that donations were not mandatory assessments."). The Court estimated in *Pipefitters* that 800,000 of five million CIO members contributed to PAC. We do not rely on high or low rates as litmus indicia of coercion or its absence; we simply point out that the figures in the record do not substantially aid plaintiffs' case.

**83.** Footnote added. Plaintiffs rely on the district court's Findings of Fact 73–79, 84, App. 51–53, indicating that career employees contribute in amounts ten to twenty times as large as the average national contribution to presidential candidates (for 1976, $26.86; 1980, $49.50). Among "senior management" or "senior executives," of course, the amounts are larger still. *Id.* Shareholders of Dart Industries, by comparison, contributed in 1979 an average of $27.45 to Dart PAC. Findings of Fact 85, App. 53. These statistics are not surprising. Because executive and administrative employees, especially "senior management" officials (many of whom may well be shareholders and subject to solicitation in that capacity), are likely to have substantially higher incomes than the average adult, one might expect the amount the career employee contributed to be commensurately larger. Then too, there is the variable difficult to reduce to figures: the degree of affinity a career employee has toward his corporation, and the enthusiasm he shows for its PAC. *See* text at pages 1107–1108. *supra.*

**84.** Brief for Plaintiffs at 33.

**85.** *See* text at pages 1101, 1102–1103 *supra*. *See also National Right to Work Comm., Inc. v. FEC*, 665 F.2d 371, 375 n.9 (D.C. Cir. 1981) ("[Section] 441b(b)(4)(A) restricts corporations and labor organizations to the solicitation of those individuals likely to be harmed by corporate or union overindulgence in the political arena.").

**86.** *See* text accompanying notes 68–71 *supra*.

fices to say that the proof plaintiffs offer falls woefully short.

Plaintiffs' attempt to extract support from case law fares no better. They rely on two Supreme Court decisions rejecting constitutional challenges to restrictions Congress placed on the political activities of public employees: *Ex Parte Curtis*, 106 U.S. 371, 1 S.Ct. 381, 27 L.Ed. 232 (1882); *Civil Service Commission v. National Association of Letter Carriers*, 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973), *reaffirming United Public Workers v. Mitchell*, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947). In *Curtis* the Court upheld against constitutional assault a statute prohibiting certain federal employees from "requesting, giving to, or receiving from, any other officer or employee of the government, any money or property or other thing of value for political purposes." 106 U.S. at 371, 1 S.Ct. at 382. In *Letter Carriers*, the Court upheld against a second major First Amendment challenge (the first was in *Mitchell*) the Hatch Act's ban on federal employee political activity.

We note a certain irony in plaintiffs' resort to these cases. In both, the challengers raised constitutional objections to restrictions on political activity imposed by Congress. The Court rejected those objections. Plaintiffs serve up these cases in an effort to persuade us that Congress not only may but must restrict because the First Amendment so commands. In *Letter Carriers* as in *Curtis*, the Court deferred to the congressional judgment that "partisan political activities by federal employees must be limited if the Government is to operate effectively and fairly, elections are to play their proper part in representative government, and employees themselves are to be suffi-

ciently free from improper influences." 413 U.S. at 564, 93 S.Ct. at 563. While the Court recognized the legitimacy of congressional action to secure federal employees from "pressure and from express or tacit invitation to vote in a certain way or perform political chores in order to curry favor with their superiors rather than to act out of their own beliefs," 413 U.S. at 566, 93 S.Ct. at 2891, the Court never suggested that Congress was obliged by the Constitution to impose such protection.[87]

In short, we find scant instruction for the problem at hand in cases deferring to a legislative decision alleged to invade First Amendment rights to associate and to participate in political activities. With regard to the issue we confront, the Court's firm rejection of the First Amendment challenges in *Letter Carriers* suggests to us only that the area is one in which the considered decision of Congress should attract the judiciary's attention and respect. We therefore turn to the views expressed in Congress relevant to the coercion potential in corporate PAC solicitation of career employees.

### 2. The considered judgment of Congress and the deference due it.

Congress was aware of the potential for coercion of career employees when it permitted their solicitation by corporate PACs subject to specified safeguards. Legislative concern that unrestricted solicitation by corporations and labor unions would trench on an individual's political beliefs was a major force behind the restrictions Congress enacted in the Hansen amendment of 1971. Representative Hansen, speaking of corporate PAC solicitation of shareholders

---

**87.** *See also* Mem.Op., *supra* note 7, at 6, App. 15 (commenting with respect to *Letter Carriers*: "The need to remove political pressures was justified not as a means of protecting the first amendment rights of government employees, but to advance the highly valued public policy of non-partisan administration."). Plaintiffs also quote out of context *Martin Tractor Co. v. FEC*, 627 F.2d 375, 387 (D.C. Cir.), *cert. denied*, 449 U.S. 954, 101 S.Ct. 360, 66 L.Ed.2d 218 (1980), stating that "this Court has already recognized the sensitive nature of PAC solicita-

tion in the inherently coercive context of employer-employee relationships." Reply Brief at 9. But the "solicitation" to which the quote referred was corporate PAC solicitation of *hourly* employees. FECA strictly confines solicitation of hourly employees to two written communications within one year, addressed and mailed to the employees at their home, and designed so that anonymity may be guaranteed for those who either do not contribute or contribute less than $50. Section 441b(b)(4)(B).

and labor PAC solicitation of union members, stated:

> This [amendment] is intended to insure that a solicitor for COPE or BIPAC cannot abuse his organizational authority in seeking political contributions. *Of course, nothing can completely erase some residual effects on this score*, any more than the law can control the mental reaction of a businessman asked for a contribution by an individual who happens to be his banker, or of a farmer approached by the head of his local farm organization. The proper approach and the one adopted here, is to provide the strong assurance that a refusal to contribute will not lead to reprisals and to leave the rest to the independence and good sense of each individual.[88]

During the floor debate on the 1976 amendments, similar concerns were expressed. In the House, Representative Thompson spoke of "the coercion inherent in the solicitation of employees by employers": [89]

> [W]ith respect to employee coercion, it is simply a fact that solicitations by an employer, no matter for what purpose, and no matter how well-intentioned, are psychologically coercive. The employee is going to be intimidated and coerced, because the entity soliciting the funds is, for all practical purposes, the same as, or closely related to the one which also gives the salary raises and promotions. This fundamental principle was a major reason for the particular balance established by section 610 in 1971, which the SUNPAC advisory opinion so drastically altered in 1975.
>
> This bill corrects th[is] Commission-created problem[ ].[90]

In the Senate, Senator Bumpers spoke out against the second amendment Senator Packwood offered that would have authorized corporate and labor PACs to solicit non-union, *non-supervisory* employees.[91]

> MR. BUMPERS. The last amendment which was just defeated, I think, troubled most of the Members in this body for a very simple reason: Everybody is concerned about the possibilities of a gentle, nevertheless overt, pressure when employees are solicited by their employer.
>
> ... The thing that troubles me about that is that it occurs to me that the pressure is really more stark in the instance where the employee is not unionized and does not have anyone as a bulwark between him and the employer. He has no organization; he has no one to protect him if he decides to say no to the employer. Does the Senator not see that as a problem?
>
> MR. PACKWOOD. It is a problem. It is illegal under existing law to coerce or pressure anyone into making contributions, but the Senator from Arkansas is correct; I will admit it is a problem....
>
> MR. BUMPERS. I thank the Senator. That answers my question. I see the Senator is cognizant of the problem. I am not talking about the question of where there is overt pressure to either give or you will not have a job next week, but I think the pressure is there, and that troubles me.[92]

Senator Brock, although he spoke *for* the second Packwood amendment, sounded a similar theme:

> MR. BROCK. Mr. President, I want to be very sure we understand what we are doing here.... I would like to be very honest: any of these pacts [sic], they all bother me. There is implicit in a pact

---

**88.** 117 Cong.Rec. 43381 (1971) (remarks of Representative Hansen) (emphasis added).

**89.** 122 Cong.Rec. 8881 (1976) (remarks of Representative Thompson). Since this statement was made in reference to the Commission's *SUNPAC* ruling, which allowed a corporate PAC to solicit all of the corporation's employees, it does not offer substantial support for the proposition that corporate solicitation, even

when *confined to executive and administrative employees*, is nevertheless *per se* coercive.

**90.** *Id.* (emphasis added).

**91.** The Senate rejected this amendment. *See* text accompanying notes 34–36 *supra*.

**92.** 122 Cong.Rec. 6959–60 (1976).

[sic], if not the fact at least the opportunity for pressure. That bothers me greatly. It occurs just as much in a union shop as it does with a corporation soliciting its lower management group, and I think *it is something we ought to be troubled about,* and we ought to be extremely careful what we do.

I do not know how to resolve that because I do know how to limit voluntary associations for public purposes. I think they are very good, but, boy, it does trouble me to have a law setting these things up with full understanding, in a posture whereby people can be abused, or at least be concerned about being abused. That is the real danger. They do not know what is going to happen. They do not know if they are going to have their union card pulled or if they are going to lose that opportunity for promotion.[93]

These statements, read in isolation, might be thought to reflect an undifferentiated, across-the-board concern about solicitation of all employees, regardless of their place in the employment hierarchy. But read in the context of the entire legislative history, the statements confirm a dominant concern in Congress about the risk of coercion and intimidation of *hourly* employees.[94] The statutory language plainly demonstrates that concern: solicitation of hourly employees is severely restricted; solicitation of career employees is generally permitted, but is brigaded with protections designed to prevent overreaching. We recall here the evil Congress perceived in the *SUNPAC* ruling (allowing corporate PACs to solicit *all* employees) and the method Congress

chose to overrule it (section 441b(b)(4)). In 1971, Congress, in an effort to protect union members and corporate shareholders against arm-twisting solicitation, enacted several safeguards—now codified at section 441b(b)(3)(A)–(C). Congress believed these measures would eliminate, or at least substantially deter, coercive tactics. When Congress extended corporate solicitation to reach executive and administrative personnel in 1976, it extended as well the protections earlier afforded union members and shareholders. There is no indication that Congress believed or had cause to believe its safeguards ineffective in the interim between the enactment of FECA and the 1976 amendments. Nor is there any evident reason to believe that protections Congress relied upon to secure union members against union pressure would be less adequate in securing career employees against corporate pressure.[95]

The judgment of Congress in this domain, as *Letter Carriers* suggests, is entitled to particular respect. *See also CBS, Inc. v. Democratic National Committee,* 412 U.S. 94, 102–03, 93 S.Ct. 2080, 2086–87, 36 L.Ed.2d 772 (1973). Congress took into account competing interests "in the context of the political arena where the expertise of legislators is at its peak and that of judges is at its very lowest." *First National Bank of Boston v. Bellotti,* 435 U.S. 765, 804, 98 S.Ct. 1407, 1430, 55 L.Ed.2d 707 (1978) (White, J., dissenting). The legislative history demonstrates congressional attention to the multi-faceted speech and political participation concerns at stake.[96] Plaintiffs

---

**93.** *Id.* at 6960 (remarks of Senator Brock).

**94.** Representative Thompson believed that the 1976 amendments "corrected" the problem of employee coercion, and spoke in favor of the amendments. *See* text accompanying note 90 *supra.* The statements of Senators Bumpers and Brock concerned the second Packwood amendment, which would have extended corporate solicitation to include non-union, non-supervisory employees.

**95.** The district court, in its evaluation of plaintiffs' statutory argument, was of a similar mind. *See* Mem. Op., *supra* note 7, at 6, App. 15.

**96.** We must count among these concerns the interest of a corporation in communicating with and soliciting its shareholders and employees, an interest emphasized by Congress in the Hansen amendment and explicitly acknowledged as sheltered within the First Amendment by the Supreme Court. *See First Nat'l Bank of Boston v. Bellotti,* 435 U.S. 765, 776–83, 98 S.Ct. 1415–19, 55 L.Ed.2d 707 (1978); *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). *But cf. California Medical Ass'n v. FEC,* 101 S.Ct. 2712, 2721–22 (1981) (Marshall, J., joined by Brennan, White, and Stevens, JJ.) (trade association's contribution to PAC is speech-by-proxy not entitled to full First Amendment protection).

have offered no convincing argument in support of their plea that we upset the decision Congress made.

Plaintiffs recite a host of cases [97] alleged to stand for the principle that "in areas within the reach of the First Amendment government can neither inhibit individual freedom nor compel activism of the individual." [98] But this is desperate argument. In each of the cases plaintiffs cite, the Court struck down *government requirements* or actions that compelled an individual to speak or associate against personal political or religious beliefs. Here, the *government* neither *requires* career employees to contribute to their PAC against their will nor *requires* corporations to set up a PAC and solicit their career employees; government merely permits such solicitation, and enforces restrictions designed to check attempts to coerce contributions. Whatever the scope of an individual's First Amendment right of political abstention, we hold that the statutory authorization of corpo-

rate PAC solicitation of executive and administrative employees does not curtail that right. We thus conclude that the in-person, group, and supervisor solicitation of career employees that the statute allows, subject to controls against abuse, does not unconstitutionally encroach upon individual rights of political association and expression.

C. *Does the use of general corporate assets to establish and support a corporate PAC violate the First Amendment rights of dissenting shareholders?*

■ The third certified constitutional question also concerns an alleged right of political abstention: Has Congress, by authorizing a corporation to use its assets to finance the administrative costs of its PAC,[99] impermissibly impinged upon the First Amendment rights of shareholders who object to such use of corporate assets? [100] Plaintiffs reason that Congress

---

The ruling plaintiffs seek, that the solicitation at issue *per se* violates the First Amendment rights of career employees, might well *require* Congress to ban all such solicitation. Such a ban, in turn, might invite constitutional challenge at least as plausible as the one presented here.

**97.** *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980) (patronage dismissal of assistant public defender violates First Amendment); *Abood v. Detroit Board of Educ.*, 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977) (use of compulsory union dues for political purposes violates First Amendment rights of dissenting employee, *see* text at pages 1116–1117 *infra*); *Wooley v. Maynard*, 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977) (state requirement that vehicle owners display "Live Free or Die" motto on license plates violates First Amendment right to refrain from speaking); *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (discharge or threat of discharge of public employees because of partisan political affiliation or nonaffiliation violates First Amendment); *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) (unemployment compensation cannot be denied an individual who refuses for religious reasons to accept Saturday employment); *Torcaso v. Watkins*, 367 U.S. 488, 81 S.Ct. 1680, 6 L.Ed.2d 982 (1961) (public office job seeker cannot be required to declare a belief in God); *Speiser v. Randall*, 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958) (statute requiring loyalty oath as a condition to

receiving property tax exemption violates First Amendment); *Wieman v. Updegraff*, 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952) (state employees cannot be required to take a loyalty oath denying affiliation with Communist Party); *West Va. Board of Educ. v. Barnette*, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943) (schoolchildren cannot be compelled to recite pledge of allegiance).

**98.** Brief for Plaintiffs at 37.

**99.** Section 441b(b)(2)(C) excludes from the definition of "contribution or expenditure," and thus specifically permits, "the establishment, administration, and solicitation of contributions to a separate segregated fund to be utilized for political purposes by a corporation, labor organization . . . ." The Supreme Court in *Pipefitters* held expressly that the Hansen amendment "plainly permits" the use of general union monies for the establishment and support of labor union PACs. 407 U.S. at 428–31, 92 S.Ct. at 2271–72. *See also Buckley v. Valeo*, 424 U.S. at 28 n.31, 96 S.Ct. at 639 n.31 ("Corporate and union resources without limitation may be employed to administer these funds and to solicit contributions from employees, stockholders, and union members.").

**100.** All four corporations (of the eleven named in plaintiffs' administrative complaint), whose solicitation methods and practices were discovered in the district court for the purpose of

has forced them to forfeit their right to be free of "compulsory political exactions by sanction of law" because FECA permits their corporation to spend money in aid of political action they disapprove.[101]

Again we encounter at the threshold a formidable "governmental (state) action" issue but, for the reasons indicated earlier,[102] we pretermit the question. We reject plaintiffs' third claim because it stretches beyond reasonable proportion the doctrine plaintiffs would press into service.

Plaintiffs rely on *International Association of Machinists v. Street*, 367 U.S. 740, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961), and *Abood v. Detroit Board of Education*, 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977), decisions concerning the use of compulsory union dues[103] by a labor PAC to fund and promote the election of certain candidates.

In *Street*, the Court made no constitutional determination. Rather, it construed Section 2, Eleventh of the Railway Labor Act[104] to "deny the unions, over an employee's objection, the power to use his exacted funds to support political causes which he opposes." 367 U.S. at 768–69, 81 S.Ct. at 1799–1800.

In *Abood*, the Court held that the First Amendment prohibited a public employee union from requiring any employee "to contribute to the support of an ideological cause he may oppose as a condition of holding a job":

> We do not hold that a union cannot constitutionally spend funds for the expression of political views, on behalf of political candidates, or toward the advancement of other ideological causes not germane to its duties as collective-bargaining representative. Rather, the Constitution requires only that such expenditures be financed from charges, dues, or assessments paid by employees who do not object to advancing those ideas and who are not coerced into doing so against their will by the threat of loss of governmental employment.

431 U.S. at 235–36, 97 S.Ct. at 1799–1800 (footnote omitted). We acknowledge, as plaintiffs point out, that the *Abood* majority did not declare a principle applicable only to public employee unions. Rather, the offending "governmental action" stemmed from a state statute that sanctioned the agency-shop agreement, which made the payment of all union fees and dues a condi-

---

developing a record for our constitutional adjudication, finance the organization and operating costs of their PACs from general corporate assets. Findings of Fact 185–94, App. 74–76.

Plaintiffs Alan and Anne Morrison jointly own common stock of the Eaton Corporation, whose PAC is operated from general corporate assets. Findings of Fact 187–88, 199, App. 55, 58. Plaintiffs' complaint in the district court included the Morrisons' protest that the use of corporate assets to operate Eaton Corporation's PAC constituted "the use of their monies for political purposes which they do not approve." Complaint, ¶ 7, App. 4. The complaint also includes an allegation that IAMA, as an institutional investor, objects to the "coerced political use of corporate assets." Complaint, ¶ 8, App. 4. The district court found that the IAMA Officers and Employees Pension Fund owns stock in three corporations targeted in plaintiffs' administrative complaint: Union Oil Co., Standard Oil of Indiana, and General Motors Corp. Findings of Fact 199, App. 58. The record does not disclose, however, whether these corporations use corporate assets to operate their PACs. (Although we have held that IAMA lacks the requisite standing to serve as a plaintiff in this action, *see* page 1097 *supra*, William Winpisinger, as

IAMA President, and Eugene Glover, as trustee of the Union's Pension Fund, *see* note 2 *supra*, are individuals eligible to vote in federal elections and thus may raise this issue on behalf of IAMA.)

**101.** *See* Reply Brief for Plaintiffs at 10–11; Brief for Plaintiffs at 42.

**102.** *See* text at page 1110 *supra*.

**103.** Under the union-shop agreement the Court held constitutional in *Railway Employees' Dep't v. Hanson*, 351 U.S. 225, 238, 76 S.Ct. 714, 721, 100 L.Ed. 1112 (1956), "an employee must become a member of the union within a specified period of time after hire, and must as a member pay whatever union dues and fees are uniformly required." Under an agency-shop agreement, upheld as constitutional in *Abood*, an employee may refuse to join the union, but must as a condition of continued employment pay to the union all fees and dues required of union members. *Abood*, 431 U.S. at 217 n.10, 97 S.Ct. at 1790 n.10.

**104.** 45 U.S.C. § 152, Eleventh.

tion of job retention. 431 U.S. at 226–27, 97 S.Ct. at 1794–95. The Court quoted an earlier opinion:

[T]he federal statute is the source of the power and authority by which any private rights are lost or sacrificed.... *The enactment of the federal statute authorizing union shop agreements is the governmental action on which the Constitution operates....*

431 U.S. at 218 n.12, 97 S.Ct. at 1791 n.12 (*quoting Railway Employees Department v. Hanson,* 351 U.S. 225, 232, 76 S.Ct. 714, 718, 100 L.Ed. 1112 (1956)) (emphasis added).

But plaintiffs reach too far in equating the situation of a worker who is compelled to join a union, or to pay union dues on pain of losing his employment, with that of a shareholder in a publicly-held company whose livelihood does not depend on retaining stock in a corporation involved in political activity he opposes and whose investment is tenuously linked to the establishment and operation of the corporation's PAC. The worker's situation is often instinct with coercion, the shareholder's, at least when the corporation is publicly held, generally will not bear the same characterization. As the Supreme Court noted in *First National Bank of Boston v. Bellotti,* 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707

(1978): "[T]he shareholder invests in a corporation of his own volition and is free to withdraw his investment at any time and for any reason." 435 U.S. at 794 n.34, 98 S.Ct. at 1425 n.34.[105]

*Bellotti* further explained the "critical distinction" that leads us to regard plaintiffs' argument as insubstantial:

In [*Street* and *Abood*] employees were required, either by state law or by agreement between the employer and the union, to pay dues for a "service fee" to the exclusive bargaining representative. To the extent that these funds were used by the union in furtherance of political goals, unrelated to collective bargaining, they were held to be unconstitutional because they compelled the dissenting union member " 'to furnish contributions of money for the propagation of opinions which he disbelieves ....' "[ ]

The critical distinction here is that *no shareholder has been "compelled" to contribute anything....* A more relevant analogy, therefore, is the situation where an employee voluntarily joins a union, or an individual voluntarily joins an association, and later finds himself in disagreement with its stance on a political issue.

435 U.S. at 794–95 n.34, 98 S.Ct. at 1425 n.34 (emphasis added) (citation omitted).[106]

---

**105.** In *Bellotti,* the Court invalidated on First Amendment grounds a Massachusetts criminal statute prohibiting certain expenditures by banks and business corporations for the purpose of influencing the vote on referendum proposals. In considering justifications Massachusetts urged in support of the suppression of corporate speech, the Court said that the asserted state interest in "protecting the rights of shareholders whose views differ from those expressed by management on behalf of the corporation" was belied by the under- and over-inclusiveness of the statute. (The Court observed that the state's asserted interests in restricting corporate expression may be "weighty" in the context of partisan candidate elections, where the overriding concern of regulatory laws was "the problem of corruption of elected representatives through the creation of political debts.") 435 U.S. at 787–88 n.26, 98 S.Ct. at 1421–22 n.26; *id.* at 803, 819–21, 98 S.Ct. at 1438–39 (White, J., dissenting).

The question in *Bellotti* was whether a state statute, enacted in part to protect the interests of dissenting shareholders, violated a *corpora-*

*tion's* First Amendment right of political *expression.* Here, plaintiffs present the converse question: whether a statute enacted in recognition of a corporation's right to communicate with its shareholders and career employees (*see* text accompanying notes 68–69 *supra*) violates a dissenting *shareholder's* First Amendment right of political *abstention.*

**106.** Justice White disagreed with the majority's assessment; he stated:

The employees in *Street* and *Abood* were also free to seek other jobs where they would not be compelled to finance causes with which they disagreed, but we held in *Abood* that First Amendment rights could not be so burdened. Clearly the State has a strong interest in assuring that its citizens are not forced to choose between supporting the propagation of views with which they disagree and passing up investment opportunities.

435 U.S. at 818, 98 S.Ct. at 1437 (White, J., dissenting). It bears emphasis that although Justice White believed "First Amendment concerns of stockholders ... directly implicated,"

Justice Black, writing in dissent in *Street* —he would have found a constitutional violation—similarly identified the infirmity in the reasoning plaintiffs urge upon us:

> There is, of course, no constitutional reason why a union or other private group may not spend its funds for political or ideological causes *if its members voluntarily join it and can voluntarily get out of it. Labor unions made up of voluntary members free to get in or out of the unions when they please* have played important and useful roles in politics and economic affairs. How to spend its money is a question for each voluntary group to decide for itself in the absence of some valid law forbidding activities for which the money is spent. But *a different situation arises when a federal law steps in and authorizes such a group to carry on activities at the expense of persons who do not choose to be members of the group as well as those who do.* Such a law, even though validly passed by Congress, cannot be used in a way that abridges the specifically defined freedoms of the First Amendment.

367 U.S. at 788–89, 81 S.Ct. at 1809 (Black, J., dissenting) (emphasis added) (footnotes omitted). In sum, the Supreme Court's analyses relevant to plaintiffs' claim point securely to this conclusion: a dissenting shareholder in a publicly-held company who does not allege any legal or practical obligation to continue his investment, is not compelled to speak, in violation of his First Amendment right to remain silent, by a statute authorizing a corporation to use a portion of its assets to establish and maintain the corporation's political action committee. We therefore inquire no further and rule against plaintiffs on their third and final constitutional challenge.

## V. CONCLUSION

For the foregoing reasons, we hold that the 1976 amendments to FECA do not violate the constitutional rights asserted by plaintiffs. Accordingly, we answer in the negative each certified constitutional question.[107]

HARRY T. EDWARDS, Circuit Judge, concurring:

I concur in Parts I, II, III, IV.A. and IV.B. of the court's per curiam opinion. I also concur in the result reached with respect to the question posed in Part IV.C. of the majority opinion.[1] I am, however, troubled by the sharp distinction that the court draws in Part IV.C. between the interests of dissenting union members and those of dissenting corporate stockholders in political abstention. Because the analysis in the majority opinion may be read to suggest that dissenting stockholders have no legitimate interest in the use of their investments for partisan political or ideological purposes, and because in my view the court's conclusion is not compelled by Su-

---

*id.* at 816, 98 S.Ct. at 1436, he did not conclude that shareholders could establish a constitutional violation based on their disagreement with the corporation's advertised political positions. *See id.* at 814, 98 S.Ct. at 1435 ("Presumably, unlike the situations presented by *Street* and *Abood*, the use of funds invested by shareholders with opposing views by Massachusetts corporations in connection with referenda or elections *would not constitute state action* and, consequently, would not violate the First Amendment.") (emphasis added). Rather, he considered "First Amendment concerns" in the context of evaluating the Massachusetts interest in restricting corporate political activity, and concluded that the corporate speech restriction the state imposed was in harmony with the Amendment. Moreover, with all respect, we believe that relinquishing one's job and seeking employment elsewhere is not com-

parable to passing up opportunities to invest in publicly-held companies. We note that this case does not present any question with respect to a minority owner of shares in a closely-held corporation and we do not address the situation of such a shareholder.

**107.** *See* note 11 *supra.*

**1.** Part IV.C. of the court's opinion addresses the third certified question: "Do the provisions of FECA (2 U.S.C. § 441b(a) and § 441b(b)(2)) that authorize the use of general corporate assets to pay the operating costs of a corporation's separate segregated fund that makes contributions to federal candidates violate the First Amendment rights of a stockholder who objects to the use of his corporate assets for political purposes?"

preme Court precedent, I write separately to concur on grounds different from those relied upon by the majority. In particular, I would hold that plaintiffs cannot prevail on the political abstention issue due to a lack of "state (governmental) action" in this case.

## I.

Plaintiffs contend that, "[i]n approving the use of the general corporate assets for the operating costs of its PAC (2 U.S.C. § 441b(b)(2)(C)), the statute requires stockholders to bear the costs of political operations which frequently do not meet their own political interests and desires. . . . Thus, when Congress approved the use of the stockholders' assets to meet the operating costs of corporate PAC's, it authorized the involuntary use of a citizen's assets for the support of political candidates whom he may not wish to support or may actively oppose." Plaintiffs' brief at 41–42 (footnote omitted). Relying primarily on *Abood v. Detroit Board of Education*, 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977), plaintiffs argue that "[e]stablished constitutional principles bar . . . compulsory political exaction under sanction of law." Plaintiffs' brief at 42.

In *Abood*, the State of Michigan had enacted legislation authorizing a system for union representation of local government employees, including a statutory provision allowing for "agency shop" agreements. Under the authorized agency shop agreement, a public employee represented by a union could be required to pay to the union—as a condition of employment—a service fee equal in amount to union dues. The issue before the Court was "whether

[the agency shop] arrangement violate[d] the constitutional rights of government employees who object to public-sector unions as such or to various union activities financed by the compulsory service fees." 431 U.S. at 211, 97 S.Ct. at 1787. The Court held that mandatory agency shop fees could not be spent, *over an employee's objection*, "for the expression of political views, on behalf of political candidates, or towards the advancement of other ideological causes not germane to [a union's] duties as collective-bargaining representative." 431 U.S. at 235, 97 S.Ct. at 1799 (footnote omitted). In reaching this conclusion, the Court acknowledged that "[t]here will, of course, be difficult problems in drawing lines between collective-bargaining activities, for which contributions may be compelled, and ideological activities unrelated to collective bargaining, for which such compulsion is prohibited." 431 U.S. at 236, 97 S.Ct. at 1800 (footnote omitted).

Although the majority opinion in the instant case recognizes that "union members are to their union as shareholders are to their corporation," majority opinion at 1108, the court nevertheless finds *Abood* inapposite. According to the majority, corporate stockholders—the legal owners of the corporation—have *less* right to control the political use of their funds than union members. Relying on a footnote in *First National Bank v. Bellotti*, 435 U.S. 765, 794 n.34, 98 S.Ct. 1407, 1425 n.34, 55 L.Ed.2d 707 (1978), the court reasons that the political use of a stockholder's share of corporate assets is never coercive because the stockholder has no "legal or practical obligation to continue his investment." Majority opinion at 1118.[2] In contrast, the majority

---

**2.** Footnote 34 of *Bellotti*, although informative, is not controlling here. A number of features distinguish this case. First, the case before us concerns partisan candidate elections rather than a referendum proposal or ballot initiative. The Court in *Bellotti* explicitly refrained from considering the First Amendment interests of dissenting stockholders in partisan candidate elections. 435 U.S. at 787–88 & n.26, 98 S.Ct. at 1421–22 & n.26, *see also Citizens Against Rent Control v. City of Berkeley*, 102 S.Ct. 434 (1981). Second, the Court in *Bellotti* principal-

ly rejected the state interest in protecting dissenting stockholders because the underinclusiveness and overinclusiveness of the Massachusetts statute belied that purpose. 435 U.S. at 792–95, 98 S.Ct. at 1424–26. In this case, however, the dissenting stockholder's interest in political abstention is directly presented. Third, the Court noted the absence of a dissenting stockholder complaining of the corporate expenditures in *Bellotti*. *Id.* at 794 n.34, 98 S.Ct. at 1425 n.34. Those interested plaintiffs are present here. Fourth, in *Bellotti* the pro-

posits that the dues obligation under a union or agency shop agreement makes "[t]he worker's situation ... instinct with coercion." *Id.* at 1117.

With all due respect, I believe that the distinctions drawn by the majority between union members and stockholders are founded on generalized characterizations lacking any substantial basis in the record before us. One simply cannot conclude that corporate stockholders are never coerced when the money they have invested in the hope of pecuniary return is spent for political purposes. For example, while stockholders often have a ready market for their corporate shares, that may not be true for the minority owner of shares in a closely held corporation. If such a minority owner's principal source of income is the dividend distributions from his corporate holdings, who is to say that he is not coerced if the corporation establishes and finances a PAC that supports candidates who are antithetical to his political views? How is this minority stockholder different from the union member whose livelihood depends on her job and who complains if her union contributes a portion of her mandatory dues to a political candidate whom she opposes?[3] The majori-

ty opinion, in my view, errs when it ignores such situations that run counter to its generalized analysis. As Justice Frankfurter noted: "Generalizations are treacherous in the application of large constitutional concepts." *Hughes v. Superior Court,* 339 U.S. 460, 469, 70 S.Ct. 718, 723, 94 L.Ed. 985 (1950).[4]

## II.

While I cannot embrace the rationale in Part IV.C. of the majority opinion, I nevertheless concur in the result. Rather than holding that corporate financing of PACs never coerces dissenting stockholders (and that union support of political causes and candidates always coerces dissenting union members), I would hold that the plaintiffs cannot prevail on the political abstention issue for want of "state (governmental) action."[5] *See First National Bank v. Bellotti,* 435 U.S. 765, 814, 98 S.Ct. 1407, 1435, 55 L.Ed.2d 707 (1978) (White, J., dissenting).

In finding no governmental action here, I start with certain critical assumptions. First, it is my understanding that, absent some lawfully enacted congressional or state prohibition, a private company may freely expend or contribute corporate funds

---

posed remedy for the infringement of the right of political abstention was the total silencing of the majority. *Id.* The plaintiffs here seek only to forbid the corporate finance and operation of PACs; the PACs could conceivably continue as self-sufficient and self-financing entities. These four distinguishing features become all the more important in light of the five to four split in the Supreme Court in *Bellotti.*

**3.** Nor is it possible to conclude by pure deduction that *all* dissident union members necessarily would be coerced if union dues were used for political purposes. For example, a skilled tradesman in a tight job market might have a wide choice of jobs—just as the owner of a publicly traded stock has a wide choice of stocks. The Supreme Court in *Abood,* however, did not distinguish between union members based on their ability to find alternative employment. This suggests that the Court did not believe that the ability to take one's services, or one's savings, elsewhere is an adequate protection for the right of political abstention. *See First Nat'l Bank v. Bellotti,* 435 U.S. 765, 818, 98 S.Ct. 1407, 1437, 55 L.Ed.2d 707 (1978) (White, J., dissenting).

**4.** I also believe that the court's analysis ignores, and thereby depreciates, established principles of corporate law. Corporate stockholders are the *legal owners* of their corporation, not merely holders of negotiable debentures. They therefore have legal remedies, such as a derivative suit, for what they perceive as improper acts by those charged with directing and managing the company. *See, e.g., First Nat'l Bank v. Bellotti,* 435 U.S. 765, 795, 98 S.Ct. 1407, 1426, 55 L.Ed.2d 707 (1978); *Cort v. Ash,* 422 U.S. 66, 84, 95 S.Ct. 2080, 2090, 45 L.Ed.2d 26 (1975). Thus, the court's reasoning that stockholders are not harmed or coerced by political expenditure of corporate assets because they can sell their stock directly contradicts the legal basis of the derivative suit. If taken to its logical extreme, the court's analysis would imply that the derivative suit is unnecessary as long as the negotiability of the stock is not diminished.

**5.** My conclusion that there is no "state action" here applies as well with respect to the question posed in Part IV.B. of the majority opinion. I concur in the court's disposition of that question on the merits as an alternative holding.

for partisan political purposes. Second, possibly as a corollary to the first proposition, I assume that the Federal Election Campaign Act (FECA), as a legislative enactment, is not constitutionally compelled. Therefore, although I recognize that FECA regulates the creation of corporate PACs and imposes certain limitations on political contributions, I do not view the Act as *authorizing* activity that would otherwise be unlawful. *See* note 6 *infra.*

Furthermore, I am unwilling to assume that "[c]orporate use of stockholder assets to operate employee PACs *results* from Congressional action." Plaintiffs' brief at 43 n.14 (emphasis added). There is no concrete evidence to support this suggestion and it appears to me to be counter-intuitive. In other words, I assume that it is highly likely that corporate funds would be contributed to political campaigns, at levels at least comparable to present levels of contribution, absent any legislative regulation or prohibition. I therefore do not view the enactment of FECA, or any like statute, as encouraging corporate political donations.[6]

With these assumptions in mind, I have great difficulty in comprehending how FECA can be perceived as satisfying the "state action" requirement. The corporate political activity in this case—without more—is purely *private action.* Although it is true that the "state action" standard is rarely susceptible to a simple definition, at the least we know that the conversion of private action into governmental action for purposes of constitutional adjudication requires some governmental involvement in, or encouragement of, the private action in question. *See, e.g., Peterson v. City of Greenville,* 373 U.S. 244, 247–48, 83 S.Ct. 1119, 1120–21, 10 L.Ed.2d 323 (1963); *Burton v. Wilmington Parking Authority,* 365

U.S. 715, 722, 81 S.Ct. 856, 860, 6 L.Ed.2d 45 (1961). I can find no such governmental involvement or encouragement in this case.

The fact that a corporation is a legal entity created pursuant to a state's laws does not imbue all of its actions with the state's authority for constitutional purposes. *Cf. Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 350–51, 95 S.Ct. 449, 450, 42 L.Ed.2d 477 (1974) (action of regulated public utility not state action); *Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972) (action of private club granted state liquor license not state action). Nor does mere governmental "acquiescence in a private action convert[ ] that action into that of the State." *Flagg Brothers v. Brooks,* 436 U.S. 149, 164, 98 S.Ct. 1729, 1737, 56 L.Ed.2d 185 (1978). In this case no more than acquiescence is involved. Congress has neither required, encouraged, nor coerced the creation of corporate PACs. Neither has it required corporations to fund the operating expenses of PACs or to solicit stockholders and executive employees. These corporate actions are entirely voluntary.

It would seem to me that, but for the confused state of the law reflected in the agency and union shop cases,[7] the "state action" question in this case would be relatively simple. The principal source of confusion is the Supreme Court's majority opinion in *Abood, supra.* Although *Abood* involved *public* employers and *public* employees, the majority opinion there, relying heavily on *Railway Employees' Department v. Hanson,* 351 U.S. 225, 76 S.Ct. 714, 100 L.Ed. 1112 (1956), assumed that "[t]he differences between public- and private-sector collective bargaining simply do not translate into differences in First Amendment rights." 431 U.S. at 232, 97 S.Ct. at 1798.

---

**6.** Obviously, FECA was a permissive piece of legislation in the sense that it lifted the prior ban against the expenditure of corporate funds in federal election campaigns. This, to me, however, is not the same as *encouraging* (or coercing) action that might not otherwise occur pursuant to voluntary choice.

**7.** *Compare Linscott v. Millers Falls Co.,* 440 F.2d 14 (1st Cir.), *cert. denied,* 404 U.S. 872, 92

S.Ct. 77, 30 L.Ed.2d 116 (1971), *with Reid v. McDonnell Douglas Corp.,* 443 F.2d 408 (10th Cir. 1971). *See also Buckley v. American Fed'n of Television & Radio Artists,* 496 F.2d 305, 309–10 (2d Cir.), *cert. denied,* 419 U.S. 1093, 95 S.Ct. 688, 42 L.Ed.2d 687 (1974); *Havas v. Communications Workers of America,* 509 F.Supp. 144 (N.D.N.Y.1981).

The majority opinion in *Abood* also cited Justice Douglas' concurring opinion in *International Association of Machinists v. Street*, 367 U.S. 740, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961), to show that

> *Hanson* nowhere suggested that the constitutional scrutiny of the agency-shop agreement was watered down because the governmental action operated less directly than is true in a case [involving *public* employers and employees]. Indeed, Mr. Justice Douglas, the author of *Hanson*, expressly repudiated that suggestion:
>
> > "Since neither Congress nor the state legislatures can abridge [First Amendment] rights, they cannot grant the power to private groups to abridge them. As I read the First Amendment, it forbids any abridgement by government whether directly or indirectly." *Street*, 367 U.S., at 777 [81 S.Ct. at 1804] (concurring opinion).

431 U.S. at 227 n.23, 97 S.Ct. at 1795 n.23.

At first blush, it might appear that *Abood* and *Hanson* are dispositive of the "state action" question in this case. Logically extended, the holdings in these two cases seem to support plaintiffs' contention that "[w]hen corporate action is authorized by and derives from Congressional action, constitutional limitations clearly apply." Plaintiffs' brief at 43 n.14. Unfortunately, the issue is not so simple. For one thing, the decision in *Hanson* (which provides the underpinning for the "state action" holdings in *Abood*) is hardly free from ambiguity. For another thing, I do not believe that the alleged governmental action here can be equated with the governmental action found in the agency or union shop cases.

In *Hanson*, a group of railroad employees brought a suit in a Nebraska court to enjoin enforcement of a union shop agreement. The challenged union shop clause was authorized by the Railway Labor Act, 45 U.S.C. § 152, Eleventh. That section of the Railway Labor Act also shielded a union shop clause from the otherwise prohibitory "right to work" provision in the Nebraska Constitution. The Nebraska Supreme Court upheld an injunction against the enforcement of the union shop clause on the grounds that it deprived employees of the right of freedom of association protected by the First Amendment. The Supreme Court agreed that the case presented justiciable questions under the First and Fifth Amendments. However, as was noted in *Abood*, the Court in *Hanson* found that

> the Railway Labor Act pre-empts any attempt by a State to prohibit a union-shop agreement. Had it not been for that federal statute, the union-shop provision at issue in *Hanson* would have been invalidated under Nebraska law. The *Hanson* Court accordingly reasoned that government action was present: "[T]he federal statute is the source of the power and authority by which any private rights are lost or sacrificed.... The enactment of the federal statute authorizing union shop agreements is the governmental action on which the Constitution operates ...." 351 U.S., at 232 [76 S.Ct., at 718].

431 U.S. at 218 n.12, 97 S.Ct. at 1791 n.12. Unlike the situation in *Hanson*, this case does not involve action authorized by a federal statute that, by its terms, preempts contrary state law. Absent FECA, or some like statute, corporate contributions to federal election campaigns would be plainly lawful.

Additionally, even if *Hanson* cannot be distinguished because, unlike the Railway Labor Act, FECA does not here preempt state law, there is an equally compelling reason to reject a finding of "state action" in this case. In *Hanson*, in finding "state action," the Court obviously was persuaded that precedents such as *Shelley v. Kraemer*, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948), were controlling. Thus, the opinion in *Hanson* stresses that,

> [i]f private rights are being invaded, it is by force of an agreement made pursuant to federal law which expressly declares that state law is superseded.... In other words, the federal statute is the source of the power and authority by which any private rights are lost or sacrificed.

351 U.S. at 232, 76 S.Ct. at 718. The Court then added that, *in this context,* "[o]nce courts enforce the agreement the sanction of government is, of course, put behind them." *Id.* at n.4.

The instant case, however, in no way resembles the circumstances presented in *Hanson.* Here, plaintiffs have lost no rights by virtue of federal law.[8] Moreover, unlike *Hanson* and *Shelley,* there is no issue here involving the "sanction of government" attributable to judicial enforcement of constitutionally suspect private agreements.

Admittedly, the "state action" question is not an easy one, and no answer is free from doubt. Nevertheless, on the facts of this case, I simply cannot find the requisite governmental action to warrant a consideration of plaintiffs' constitutional claims with respect to political abstention. On this basis, I concur.

**8.** With respect to the issue being considered here, FECA, realistically considered, limits (or at least regulates) the rights of corporations to make political contributions in federal elections. The Act was not designed to limit the plaintiffs' rights of political expression, except insofar as plaintiffs are restricted as the legal owners of regulated corporations. As noted above, absent FECA, or some like statute, corporate contributions to federal election campaigns would be both lawful and unregulated.